# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2013-1253, -1508

LLOYD RANDALL ANDERSON,

Plaintiff-Appellee,

v.

TOL, INC.,

Defendant-Appellant.

Appeals from the United States District Court for the Middle District of Tennessee in No. 12-CV-1312, Judge Aleta A. Trauger.

## CORRECTED
## APPELLANT TOL, INC.'S OPENING BRIEF

Daniel M. Cislo, Esq.
CISLO & THOMAS LLP
1333 2nd Street, Suite 500
Santa Monica, California 90401-4110
Telephone: (310) 451-0647
Fax: (310) 394-4477
*dancislo@cislo.com*

Attorneys for Defendant-Appellant
TOL, INC.

Form 9

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Lloyd Randall Anderson _____ v. TOL, Inc. _____

No. 13-1253

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
appellant TOL, Inc. _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

TOL, Inc.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

_____

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Cislo & Thomas, LLP; Daniel M. Cislo, Sean D. O'Brien

_____

| April 5, 2013 | s/ Daniel M. Cislo |
|---|---|
| Date | Signature of counsel |
| | Daniel M. Cislo |
| | Printed name of counsel |

Please Note: All questions must be answered
cc: Sean@Cislo.com, AAchamallah@Cislo.com

124

# TABLE OF CONTENTS

I.     STATEMENT OF RELATED CASES ........................................................... 1

II.    JURISDICTIONAL STATEMENT ................................................................ 1

III.   STATEMENT OF THE ISSUES ................................................................... 1

IV.    STATEMENT OF THE CASE ...................................................................... 3

V.     STATEMENT OF THE FACTS .................................................................... 4

VI.    SUMMARY OF THE ARGUMENT ........................................................... 11

VII.   ARGUMENT ............................................................................................... 15

       A.    Anderson does not have standing to bring his claims against
             TOL ................................................................................................... 15

             1.    Legal standard and standard of review ..................................... 16

             2.    Anderson does not own the asserted patents because
                   PhoenixArts owns the patents .................................................. 18

                   (a)    All right, title, and interest in and to the patents
                          was held by PhoenixArts at the time of the license
                          agreement ....................................................................... 19

                   (b)    Under Tennessee law, PhoenixArts still exists ............. 23

             3.    If the right, title, and interest in and to the patents was not
                   transferred to PhoenixArts, then those rights remain with
                   Anderson's bankruptcy estate since they were not
                   disposed of by the estate ........................................................... 24

             4.    If PhoenixArts does not own the patents, then Anderson
                   has unclean hands and is also judicially estopped from
                   personally asserting any rights to the patents because
                   Anderson never disclosed the asserted patents or the
                   related royalty income to his bankruptcy trustee ...................... 28

5.      Anderson has no standing to bring his non-patent claims (for breach of contract, fraud, or a declaration of rights under the license agreement) since he was not a party to the license agreement ................................................. 32

B.      If Anderson has standing, then the district court abused its discretion in granting the preliminary injunction and finding contempt of that preliminary injunction .............................................. 34

1.      Legal standard and standard of review ..................................... 34

2.      The district court improperly extended the preliminary injunction to reach activities outside of the United States ........ 36

(a)      U.S. patent rights have no reach outside of the United States ................................................ 36

(b)      The preliminary injunction issued by the district court was nationwide, not worldwide, in scope ............. 38

3.      The district court granted equitable relief to Anderson despite Anderson's inequitable conduct before the bankruptcy court ....................................................... 41

4.      The district court based its conclusion on patent validity only on the statutory presumption of validity and failed to construe the patents' claims or compare them to the accused products .................................................... 41

(a)      The district court did not consider the evidence of invalidity and relied only on the statutory presumption of validity ................................................ 42

(b)      The district court failed to construe the patents' claims or compare any of them to the accused products .......................................................... 47

C.      Since the district court abused its discretion in granting the preliminary injunction, the civil contempt order must be reversed ........................................................... 49

VIII.  CONCLUSION AND RELIEF SOUGHT ................................................. 50

IX.    CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7) .......53

# TABLE OF AUTHORITIES

## Cases

*Abraxis Bioscience, Inc. v. Navinta LLC*,
    625 F.3d 1359 (Fed. Cir. 2010) .............................................................. 16, 17, 18

*Allen v. Wright*,
    468 U.S. 737 (1984)..................................................................................... 16, 17

*Apple Inc. v. Samsung Elecs. Co.*,
    695 F.3d 1370 (Fed. Cir. 2012) .........................................................................34

*Arbaugh v. Y & H Corp.*,
    546 U.S. 500 (2006)............................................................................................16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................17

*Auday v. Wet Seal Retail, Inc.*,
    698 F.3d 902 (6th Cir. 2012) .............................................................................27

*Barbieri v. RAJ Acquisition Corp. (In re Barbieri)*,
    199 F.3d 616 (2d Cir. 1999) ..............................................................................15

*Biesek v. Soo Line R.R. Co.*,
    440 F.3d 410 (7th Cir. 2006) .............................................................................15

*Bohanan v. Bridgestone*,
    2007 U.S. Dist. LEXIS 26615, *24 (M.D. Tenn. Apr. 10, 2007) .......................32

*Bonito Boats v. Thunder Craft Boats*,
    489 U.S. 141 (1989)............................................................................................44

*Conair Group v. Automatik Apparate-Maschinenbau Gmbh & Automatik Mach.
    Corp.*,
    944 F.2d 862 (Fed. Cir. 1991) ...........................................................................48

*Cybor Corp. v. Fas Technologies, Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) (en banc) .........................................................48

*DeKalb Genetics Corp. v. Bayer CropScience, S.A.*,
    538 U.S. 974 (2003)............................................................................................45

*Dickerson v. Fed. Express Corp.*,
   2010 U.S. Dist. LEXIS 22742 (W.D. Tenn. Mar. 10, 2010) ...............................32

*Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*,
   235 U.S. 641 (1914) ................................................................... 36, 38, 40

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ...........................................................................35

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002) ...........................................................................44

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.*,
   802 F.2d 1367 (Fed. Cir. 1986) ...........................................................45

*In re Cundiff*,
   227 B.R. 476 (B.A.P. 6th Cir. 1998) ....................................................27

*In re Seafort*,
   669 F.3d 662 (6th Cir. 2012) ..............................................................25

*Johns Hopkins Univ. v. Cellpro, Inc.*,
   152 F.3d 1342 (Fed. Cir. 1998) ...........................................................39

*Leman v. Krentler-Arnold Hinge Last Co.*,
   284 U.S. 448 (1932)............................................................................38

*Litton Systems, Inc. v. Sundstrand Corp.*,
   750 F.2d 952 (Fed. Cir. 1984) ............................................................46

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)............................................................... 16, 17, 33

*Lund Indus. v. Go Indus.*,
   938 F.2d 1273 (Fed. Cir. 1991) ..........................................................48

*Medtronic Inc. v. Boston Sci. Corp.*,
   695 F.3d 1266 (Fed. Cir. 2012) ..........................................................49

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
   420 F.3d 1369 (Fed. Cir. 2005) .............................................. 36, 38, 40

*Nat'l Org. for Women v. Scheidler*,
  510 U.S. 249 (1994)............................................................................16

*New Eng. Braiding Co. v. A.W. Chesterton Co.*,
  970 F.2d 878 (Fed. Cir. 1992) ....................................................... 42, 47

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)............................................................................29

*Penn Fabrication (U.S.A.) v. Soulbella Enters.*,
  48 U.S.P.Q.2d (BNA) 1319 1998 U.S. Dist. LEXIS 17348 (C.D. Cal. 1998).....48

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806 (1945)...................................................................... 13, 28

*Prima Tek II L.L.C. v. A-Roo Co.*,
  222 F.3d 1372 (Fed. Cir. 2000) ..................................................... 18, 19

*Rhone-Poulenc Agro Sa v. Dekalb Genetics Corp.*,
  272 F.3d 1335 (Fed. Cir. 2001) ..........................................................45

*Scharmer v. Carrollton Mfg. Co.*,
  525 F.2d 95 (6th Cir. 1975) ........................................................... 45, 46

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
  402 F.3d 1198 (Fed. Cir. 2005) ..........................................................18

*Sciele Pharma, Inc. v. Lupin Ltd.*,
  684 F.3d 1253 (Fed. Cir. 2012) ..........................................................34

*Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik
  Aktiengesellschaft*,
  903 F.2d 1568 (Fed. Cir. 1990) ..........................................................39

*Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*,
  620 F.3d 1305 (Fed. Cir. 2010) ..................................................... 39, 40

*Titan Tire Corp. v. Case New Holland, Inc.*,
  566 F.3d 1372 (Fed. Cir. 2009) ............................................... 42, 43, 47

*Tyler v. Federal Express Corp.*,
  420 F. Supp.2d 849 (W.D. Tenn. 2005) (citation omitted), *aff'd*, 206 F. App'x
  500 (6th Cir. Nov. 16, 2006)...................................................... 25, 32

*United States v. United Mine Workers*,
    330 U.S. 258 (1947) ............................................................................49

*Waffenschmidt v. Mackay*,
    763 F.2d 711 (5th Cir. 1985) ..............................................................38

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.*,
    418 F.3d 1326 (Fed. Cir. 2005) ...........................................................44

*Warth v. Seldin*,
    422 U.S. 490 (1975)..............................................................................17

*White v. Wyndham Vacation Ownership, Inc.*,
    617 F.3d 472 (6th Cir. 2010) ........................................... 24, 29, 30, 31

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990)....................................................................... 17, 33

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008)..................................................................................35

## Statutes

35 U.S.C § 100(c) ...................................................................... 37, 38, 40

35 U.S.C. § 112 ................................................................................ 45, 46

35 U.S.C. § 271(a) ..................................................................... 37, 38, 40

35 U.S.C. § 282 ......................................................................... 45, 46, 47

35 U.S.C. § 283 ....................................................................................39

11 U.S.C. § 541(a)(1)........................................................................ 25, 26

11 U.S.C. § 554(d) ........................................................................... 12, 27

11 U.S.C. § 704(a)(8)........................................................................ 25, 27

11 U.S.C. § 1304(c) .......................................................................... 25, 27

11 U.S.C. § 1306....................................................................................26

Tenn. Code. Ann. sec. 48-245-302(c)................................................................ 23, 24

**Rules**

Fed. R. Civ. P. 12(h)(3)...............................................................................16

# I.  STATEMENT OF RELATED CASES

Other than this consolidated appeal, no other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court.

# II.  JURISDICTIONAL STATEMENT

This court has jurisdiction of this appeal under 35 U.S.C. §1295(a)(1) since the appeal is of a final decision of a district court of the United States (here, a preliminary injunction issued by the U.S. District Court for the Middle District of Tennessee) in a civil action arising under an Act of Congress related to patents.

# III.  STATEMENT OF THE ISSUES

The issues presented are:

(i)    Whether Anderson had standing to bring his claims against TOL since the asserted patents are owned by PhoenixArts, LLC, which still exists.

(ii)   Alternatively, whether Anderson had standing to bring his claims against TOL since the asserted patents are owned by Anderson's bankruptcy estate because those assets were never disclosed to the estate to be administered.

1

(iii)   Whether Anderson has unclean hands and is judicially estopped from personally asserting any rights to the patents because Anderson never disclosed the asserted patents or the related royalty income of more than $1.5 million to his bankruptcy trustee.

(iv)   Whether it was an abuse of discretion for the district court to improperly extend a preliminary injunction based on a U.S. patent to reach activities outside of the United States.

(v)    Whether it was an abuse of discretion for the district court to grant equitable relief to Anderson in view of Anderson's inequitable conduct before the bankruptcy court, namely Anderson's failure to disclose the asserted patents or the related royalty income.

(vi)   Whether it was an abuse of discretion for the district court to base its conclusion on patent validity only on the statutory presumption of validity in view of the evidence of invalidity submitted by TOL.

(vii)  Whether it was an abuse of discretion for the district court to fail to construe the patents' claims or compare them to the accused products when determining the infringement issue.

(viii) Whether the civil contempt order incident to the preliminary injunction was properly granted by the district court in view of the defects with the preliminary injunction.

2

## IV.  STATEMENT OF THE CASE

This is a case alleging patent infringement and breach of contract. The plaintiff, Anderson, claims to own three U.S. patents, and Anderson alleges that the defendant, TOL, has infringed those patents. TOL denies that it has committed any wrongdoing. Each of the asserted patents is directed to a toy balloon having several structural members. Figure 1 from U.S. Patent Nos. 6,659,838 is included here, which shows the claimed toy balloon as item 10:



Anderson also alleges that TOL breached a license agreement entered into by PhoenixArts, LLC and Overbreak, LLC. Anderson is the sole member of PhoenixArts, LLC (A881–A882, A885), and Overbreak is TOL's predecessor (A403 ¶5, A525 ¶5).

Anderson filed the district court case a few days before the holidays in 2012. Along with the complaint, Anderson also filed motions for a temporary restraining order and a preliminary injunction. The district court denied the request for a

temporary restraining order, holding that Anderson failed to establish that it is likely that he will suffer irreparable harm in the absence of the temporary restraining order. (A379.) A few weeks later, the district court granted the preliminary injunction. (A1–A24.) That order, along with the order finding TOL in contempt of the preliminary injunction, are the subjects of this appeal, and they are included in **Exhibit 1** to this brief.

The ongoing district court case is presently in the discovery phase, and fact discovery closes on February 28, 2014. The parties have not yet engaged in any formal discovery beyond exchanging initial disclosures. The case is set for jury trial to begin on Tuesday, January 27, 2015.

For the reasons discussed below, TOL asks the Court to dissolve the preliminary injunction, reverse the order of contempt for the preliminary injunction, and refer the matter to the U.S. Attorney's Office to investigate Anderson's bankruptcy fraud under 18 U.S.C. § 152, which criminalizes concealment of assets.

## V.  STATEMENT OF THE FACTS

According to Anderson's testimony before the district court, Anderson "probably invented" the toy balloon that is the subject of the patents in 2001. (A742.)

Long before this case and before Anderson filed any patent applications for the toy balloon, on February 25, 2002 Anderson individually filed a voluntary petition for Chapter 13 bankruptcy in the U.S. Bankruptcy Court for the Middle District of Tennessee. (A894.) In the bankruptcy documents, Anderson did not disclose any patents or other intellectual property (A915, A916), and those disclosures were never updated during the bankruptcy proceeding, which lasted until August 2007. (*See* A880–A889.) Anderson also never disclosed any royalty income related to any patents or other intellectual property. (*See id.*) On April 9, 2002, the bankruptcy court issued an order confirming Anderson's Chapter 13 plan. (A898–A899.)

On February 5, 2003, Anderson created PhoenixArts, LLC, a member managed, limited liability company organized under the laws of Tennessee. (A881–A882, A885.) Anderson is the only member of the LLC. (*Id.*)

Just over a week later, on February 14, 2003 Anderson filed the patent application that would eventually issue as U.S. Patent 6,659,838 asserted in this case. (A156.) Anderson is the only named inventor on the face of the patent. (*Id.*) This same patent application later served as the parent application for U.S. Patents 7,172,487 and 7,223,151, which are also asserted in this case. (A161, A167.)

On or about February 22, 2003, PhoenixArts, LLC and Overbreak, LLC entered into an agreement (the "license agreement") that, among other things,

granted Overbreak a license to produce and sell toy balloons under the patent application that eventually resulted in U.S. Patent Nos. 6,659,838, 7,172,487, and 7,223,151. (A318–A353.) Overbreak produced the licensed balloons under the HOVERDISC trademark, which Overbreak registered with the U.S. Patent and Trademark Office in 2005. (A402 ¶ 3.) Because the HOVERDISC trademark does not belong to Anderson, the HOVERDISC designation is not necessarily limited to describing the toy balloons produced under the licensed patents.

On August 19, 2003, Anderson filed the patent application that would eventually issue as U.S. Patent 7,223,151 asserted in this case. (A167.) Anderson is the only named inventor on the face of the patent. (*Id.*) Several months later, on November 12, 2003 Anderson filed the patent application that would eventually issue as U.S. Patent 7,172,487 asserted in this case. (A161.) Anderson is the only named inventor on the face of the patent. (*Id.*) There is no assignment recorded with the U.S. Patent and Trademark Office for any of the three asserted patents. (A537.)

On December 9, 2003, the U.S. Patent and Trademark Office issued the first of the three asserted patents, U.S. Patent 6,659,838, to Anderson. (A156.)

On September 17, 2004, Tennessee administratively dissolved PhoenixArts for its failure to file an annual report. (A884.) PhoenixArts was reinstated on October 28, 2004 at Anderson's request. (A886–A887.) But on August 19, 2005,

6

Tennessee again administratively dissolved PhoenixArts for failing to file another annual report. (A889.) PhoenixArts was never reinstated, and the members of the LLC did not file articles of termination. (A880.) Accordingly, PhoenixArts remains administratively dissolved. (*Id*.)

The HOVERDISC[TM] product was initially very successful, and Anderson became one of the most highly compensated inventors in the toy industry as he received more than $1.5 million dollars in royalties from Overbreak and TOL. (A402–A403 ¶ 4.) However, sales began to slow in the fall of 2006, and product returns from retailers began to outweigh sales. (*Id*.) When sales slumped, PhoenixArts and Overbreak disagreed about the allocation of certain charge-backs and expenses for purposes of calculating royalties due under the license agreement. (*Id*.) Those charge-backs and expenses were related to the high rate of product returns. (*Id*.)

On February 6, 2007, while Anderson's bankruptcy was still ongoing, the U.S. Patent and Trademark Office issued the second of the three asserted patents, U.S. Patent 7,172,487, to Anderson. (A161.)

On April 10, 2007, more than five years after Anderson filed for bankruptcy, the bankruptcy court issued an order discharging Anderson from his Chapter 13 bankruptcy. (A900.)

7

On May 29, 2007, the U.S. Patent and Trademark Office issued the third of the three asserted patents, U.S. Patent 7,223,151, to Anderson. (A167.)

Although sales never returned to the levels achieved before the fall of 2006, TOL and its predecessor continuously marketed and sold the HOVERDISC$^{TM}$ product from 2003 and never abandoned the HOVERDISC trademark. (A403 ¶ 6.) Even so, TOL and Anderson lost contact in the spring of 2007, when Anderson apparently moved from his notice address in the license agreement. (*Id.* ¶ 7.)

In June 2007, TOL assumed the assets and obligations of Overbreak. (A525 ¶ 5, A531.) TOL has many of the same shareholders, officers, assets, offices, and operations as Overbreak. (A525 ¶ 5.)

On August 3, 2007, Anderson's Chapter 13 trustee submitted the Trustee's Final Report and Account. (A902–A903.) The report indicates $66,811.05 in claims submitted by creditors and $24,187.84 actually paid to those creditors through the bankruptcy, for a shortfall of $42,623.21. (*Id.*) Anderson's creditors were not fully paid even though Anderson was receiving hundreds of thousands of dollars in royalties through PhoenixArts at the time. (*Id.*; A402–A403 ¶ 4.) On August 7, 2007, the bankruptcy court issued a final decree closing Anderson's bankruptcy. (A897.) As noted above, all of the patent applications were filed, and all of the asserted patents issued, while the bankruptcy proceeding was ongoing.

After being out of contact for around five years, in June 2012 Anderson called TOL to inquire about reinvigorating direct advertising of the HOVERDISC^{TM} product. (A403–A404 ¶ 8.) Anderson was very enthusiastic about reenergizing the product, and he expressed his desire to work together with TOL to create new concepts to be added to the product line. (*Id*.)

After the initial contact by telephone, Anderson traveled to TOL's offices in Woodland Hills, California to discuss how to better promote the HOVERDISC^{TM} product and to share ideas from Anderson and his brother to make the HOVERDISC^{TM} product more successful. (*Id*.) Those ideas included new designs and features, such as a remote control function. (*Id*.) At the meeting, Anderson never discussed any past issues, questioned why TOL continued to sell under the existing license agreement between PhoenixArts and Overbreak, or discussed any of the allegations he later made in the complaint for the district court case. (*Id*.) Instead, Anderson was extremely positive, happy to see the team that previously helped him prosper, and excited to be working together again. (*Id*.) Anderson also accepted and cashed a royalty check that he received from TOL under the terms of the existing license agreement. (A526 ¶ 8, A533–A534.)

As a result of that meeting and subsequent communications, Anderson requested and TOL agreed to update the license agreement to Anderson's financial benefit in exchange for his ideas and input. (A404 ¶ 9.) On September 25, 2012,

Anderson confirmed the updated financial terms and stated that his counsel would be sending an updated agreement. (*Id*.) However, in October 2012 Anderson backed out of the revised terms to the updated license agreement by not signing a memorandum of understanding that documented the discussed terms. (*Id*.)

Two months after backing out of the deal, in late December 2012 Anderson instead filed the district court lawsuit. (A129.) The essence of Anderson's complaint is that TOL (presumably through its predecessor Overbreak) allegedly underreported sales and made deductions from the royalties such that TOL owes Anderson more than $1.6 million in royalties under the existing license agreement. (A151 ¶ 91; A135–A136 ¶ 23.) The complaint also alleges that TOL infringed U.S. Patents 6,659,838, 7,172,487, and 7,223,151. (A148–A151.)

As noted above, along with the complaint Anderson filed motions for a temporary restraining order and a preliminary injunction. The district court denied the request for a temporary restraining order since Anderson did not establish a likelihood that he would suffer irreparable harm without a temporary restraining order. (A379.) The district court later granted the preliminary injunction (A1–A24), and then found TOL to be in contempt of that preliminary injunction because of alleged sales of the HOVERDISC™ product by Alive Products Ltd. in the United Kingdom (A25–A26, A1387–A1391). The evidence submitted by Anderson claimed that the accused products were made in China and imported by

Alive Products Ltd., a U.K. company, into England where they were sold at Hamleys, an English toy store. (A1014; A1032; A1064.)

In response to Anderson's complaint, TOL denied all of the salient allegations and brought a counterclaim for a declaration that Anderson has no contract rights to assert against TOL based on the license agreement as well as a declaration that Anderson has no patent rights to assert against TOL under U.S. Patents 6,659,838; 7,172,487; or 7,223,151.

TOL also brought a motion to dismiss Anderson's complaint. (A380–A401; A862–A871.) That motion was based on Anderson's lack of standing to bring his claims against TOL (also discussed in this appeal brief) as well as Anderson's failure to meet the forum selection clause in the license agreement, which required that the district court action should have been brought in Los Angeles County, California instead of in Tennessee. The district court denied that motion because it found that TOL was not a party to the license agreement and that, in the district court's view, Anderson was the presumptive owner of the patent since he is the only listed inventor. (A13, A15–A17, A935.)

## VI. SUMMARY OF THE ARGUMENT

To have standing to sue for patent infringement, the party bringing suit must have title to the patent, unless the party is an exclusive licensee under the patent. However, Anderson does not own the asserted patents because PhoenixArts, LLC

owns them. Specifically, sometime before February 22, 2003, Anderson transferred his rights to the patents to PhoenixArts. We know this because Anderson, as the only member of the LLC, represented in the license agreement that all right, title, and interest in and to the patents was held by PhoenixArts at the time of the license agreement. And PhoenixArts still exists under Tennessee law because it was administratively dissolved; the members of the LLC did not file articles of termination.

Alternatively, if Anderson did not transfer the right, title, and interest in and to the patents to PhoenixArts (despite his contrary representations in the license agreement), then those rights remain with Anderson's bankruptcy estate since they were not disposed of by the estate during his personal bankruptcy. Indeed, they could not have been disposed of by the estate because Anderson never disclosed to his bankruptcy trustee the three patents or the more than $1.5 million in related royalty income. And when assets are not disclosed to a bankruptcy trustee, they still belong to the bankruptcy estate. 11 U.S.C. § 554(d) ("Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.")

Moreover, if PhoenixArts does not actually own the patents, then Anderson has unclean hands and also should be judicially estopped from personally asserting any rights to the patents because Anderson never disclosed the asserted patents or

12

the related royalty income to his bankruptcy trustee. "[H]e who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). With respect to judicial estoppel, Anderson neither disclosed his underlying invention in his bankruptcy schedules nor attempted to amend those schedules to disclose his related patents, licensing rights, or royalties. As a result, the bankruptcy court confirmed Anderson's Chapter 13 reorganization plan, discharged him, and closed his bankruptcy proceedings without any knowledge of these assets. Anderson was obviously aware of these assets at the time, particularly since all of the U.S. patents at issue were applied for and issued in his name. Under the circumstances, it is difficult to appreciate how Anderson could argue that he mistakenly or inadvertently failed to disclose those royalties and assets in his bankruptcy proceedings. As a result, Anderson should be judicially estopped from now asserting any related claims in this lawsuit.

Furthermore, it was an abuse of discretion for the district court to grant equitable relief to Anderson (in the form of the preliminary injunction) in view Anderson's inequitable conduct before the bankruptcy court. That conduct pertained to the same patents asserted in the district court case. And Anderson unfairly benefited from his earlier conduct by cheating his creditors out of more than $42,000 while Anderson received more than $1.5 million in royalties under the license agreement between PhoenixArts and Overbreak.

13

If Anderson has standing, then the district court abused its discretion by extending the preliminary injunction to reach activities outside of the United States. The district court granted the preliminary injunction based only on the patent infringement issues alleged by Anderson, but U.S. patent rights have no reach outside of the United States. Consequently, there can be no patent infringement or interference with Anderson's patent rights for extraterritorial activities because those rights do not exist outside of the United States. Also, there is little risk that the products provided by Alive Products Ltd. in England would be imported into the United States because the shipping costs would make the product cost-prohibitive.

It was also an abuse of discretion for the district court to base its conclusion on patent validity only on the statutory presumption of validity when TOL presented evidence that the patents were invalid. Federal Circuit law states that the statutory presumption of validity is not sufficient for purposes of a preliminary injunction analysis if there is a challenge to the patent's validity. Here, TOL raised a challenge to the patents' validity because, based on Anderson's verified statements, practicing the patents requires proprietary knowledge. Accordingly, the patents do not meet the requirements of 35 U.S.C. § 112.

Additionally, it was also an abuse of discretion for the district court to make a conclusion on patent infringement without construing the patents' claims or

14

comparing them to the accused products, even if rudimentarily. Instead, having concluded that TOL was not a party to the license agreement or a successor to Overbreak's interest in the license agreement, the district court stated summarily that patent infringement was likely for the purposes of the preliminary injunction and had occurred for purposes of the contempt order.

In view of these issues, the civil contempt order incident to the preliminary injunction was improperly granted by the district court and should be reversed. TOL also asks the Court to refer the matter to the United States Attorney to investigate Anderson's bankruptcy fraud. *Cf. Biesek v. Soo Line R.R. Co.*, 440 F.3d 410, 413 (7th Cir. 2006) (Easterbrook, J.) ("Instead of vaporizing assets that could be used for the creditors' benefit, district judges should discourage bankruptcy fraud by revoking the debtors' discharges and referring them to the United States Attorney for potential criminal prosecution."); *Barbieri v. RAJ Acquisition Corp. (In re Barbieri)*, 199 F.3d 616, 621–22 (2d Cir. 1999) ("[I]n an appropriate case, a debtor's conduct may be referred to the United States Attorney's Office for investigation and potential criminal prosecution for bankruptcy fraud under 18 U.S.C. §§ 151–57.").

## VII. ARGUMENT

### A.    <u>Anderson does not have standing to bring his claims against TOL</u>

15

The underlying case should be dismissed in its entirety, and the preliminary injunction and contempt order should be reversed, since Anderson does not have standing to bring his claims against TOL.

1.    Legal standard and standard of review

Standing is a question of law, which the Federal Circuit reviews de novo. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1363 (Fed. Cir. 2010). The party invoking federal jurisdiction bears the burden of establishing the elements of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

A lack of standing cannot be waived, and the issue can be raised at any point in the proceedings. Fed. R. Civ. P. 12(h)(3); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."). A lack of standing may even be raised for the first time on appeal. Fed. R. Civ. P. 12(h)(3); *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 255 (1994) ("Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation.").

Article III of the Constitution restricts the federal courts to adjudicating actual cases and controversies. *Allen v. Wright*, 468 U.S. 737, 750 (1984). As such, the case-or-controversy doctrines act to limit federal judicial power in our system

16

of government. *Id*. Among the Article III doctrines (standing, mootness, ripeness, etc.), the requirement that a litigant have standing to invoke the power of a federal court is perhaps the most important of the doctrines. *Id*. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id*. at 750–51, *quoting Warth v. Seldin*, 422 U.S. 490, 498 (1975). The standing doctrine includes several limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights. *Id*. at 751.

The court may exercise jurisdiction only if a plaintiff has standing to sue on the date the plaintiff filed suit. *Abraxis*, 625 F.3d at 1364. To properly assert Constitutional standing, a plaintiff must allege an injury-in-fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. *Allen*, 468 U.S. at 751; *Lujan*, 504 U.S. at 560.

The party invoking federal jurisdiction bears the burden of establishing standing. *Id*. at 561. Moreover, the plaintiff "must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements" because "[a] federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990).

In addition, the plaintiff must have particularly stated sufficient facts in the complaint to make standing plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

17

("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (quotation marks omitted)).

To have standing in a patent case, a party must own the patent or have an exclusive, territorial license to the patent at the time the complaint was filed. *Prima Tek II L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000).

Furthermore, the standing requirement cannot be satisfied retroactively in a patent infringement suit via a *nunc pro tunc* assignment or by amending the complaint. *See, e.g., Abraxis*, 625 F.3d at 1366–67 ("[The plaintiff] was required to have legal title to the patents on the day it filed the complaint and that requirement cannot be met retroactively."); *id.* at 1367 ("As we have stated before, '[t]his court's precedent clearly establishes that a *nunc pro tunc* assignment executed after filing of a lawsuit cannot retroactively cure standing that was deficient at the time of filing.'"); *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 n.3 (Fed. Cir. 2005) ("The initial standing of the original plaintiff is assessed at the time of the original complaint, even if the complaint is later amended.").

2.    <u>Anderson does not own the asserted patents because PhoenixArts owns the patents</u>

If an inventor cannot establish ownership or an exclusive, territorial license in the patent at issue, then the inventor has no rights to assert in a patent

18

infringement action. *Prima Tek II*, 222 F.3d at 1377. Here, Anderson did not establish ownership of the asserted patents because all right, title, and interest in and to the patents was held by PhoenixArts at the time of the February 22, 2003 license agreement, and PhoenixArts still exists under Tennessee law. Alternatively, if the right, title, and interest in and to the patents was never transferred from Anderson to PhoenixArts (contrary to his representations), then those rights remain with Anderson's bankruptcy estate since they were not disposed of by the estate.

(a)    All right, title, and interest in and to the patents was held by PhoenixArts at the time of the license agreement

Anderson is the sole inventor listed for the three asserted patents. (A156–A174.) Sometime before entering into the license agreement on February 22, 2003, Anderson transferred all right, title, and interest in and to the asserted patents to PhoenixArts, LLC. (*See* A324 ¶ 8.) Specifically, in the license agreement Anderson (signing on behalf of PhoenixArts, LLC as its only member) represented and warranted that (a) PhoenixArts was the "sole legal holder" of the invention claimed in the asserted patents; (b) the invention is the "sole property" of PhoenixArts; and (c) no right to the claimed invention had been "transferred, assigned, or granted to any other party":

8. Licensor's Representations. Licensor hereby represents and warrants to Licensee that the following are true in all respects as of the Effective Date hereof and shall be true in all material respects throughout the Term:

19

(a) Licensor is now the sole legal holder of the Licensed Technology and the Licensed Technical Information.

(b) The Licensed Technology and the Licensed Technical Information are the sole property of Licensor and there are not now, nor at any time during the Term hereunder will there be, any liens, mortgages, security interests or other encumbrances against the Licensed Technology and the Licensed Technical Information or any interests therein.

(c) No share, interest, assignment, license, option or other right to any or all of the Licensed Technology and the Licensed Technical Information has been transferred, assigned, or granted to any other party.

(d) Licensor has all requisite power and authority to execute, deliver and perform all of its obligations under this Agreement.

(A324 ¶ 8.) The license agreement defines "Licensor" to mean PhoenixArts, LLC

(id. at 1) and "Licensed Technology" to mean:

All invention disclosures that are owned by Licensor as of the date hereof or acquired or created hereafter which relate to the Products or any other device or product that incorporates or relies on the Licensed Technical Information, including without limitation the patent application described on Schedule A; all other patents acquired or created by Licensor after the date hereof that relate to Products or any other device or product that is comparable to, or competes with the Products, or that incorporates or relies on the Licensed Technical Information, and all foreign counterparts thereof; all patents of Licensor which issue, whether directly, or through continuation, continuation-in-part, divisional applications or otherwise, from the foregoing patent applications and invention disclosures, both U.S. and foreign; all patents reissuing on, or issuing as a result of reexamination of, any of the foregoing patents to Licensor, both U.S. and foreign, but shall not include any Overbreak Proprietary Rights; and all trademarks, trade names, designs and logos owned by Licensor as of the date hereof or

> acquired or created hereafter which relate to the Products or any other device or product that incorporates, relies on or uses the Licensed Technical Information, including without limitation, the common law or registered trademarks described on Schedule B, but shall not include any Overbreak Proprietary Rights.

(*Id.*) Schedule A to the license agreement included the application that resulted in the asserted patents. (A326–A351; *see also* A133 ¶ 12 ("The HoverDisc is protected by one or more claims of the Anderson Patents. . . . The HoverDisc, together with all other products covered by the Anderson Patents, are referred to in this Complaint as the 'Patented Products.'"); A133–A134 ¶ 16 ("Pursuant to Section 2 of the License Agreement, PhoenixArts granted Overbreak an exclusive license to manufacture, distribute, advertise and sell the Patented Products worldwide").)

Consequently, PhoenixArts purportedly had the right ("Licensor is now the sole legal holder of the Licensed Technology"), title ("The Licensed Technology and the Licensed Technical Information are the sole property of Licensor"), and interest ("there are not now, nor at any time during the Term hereunder will there be, any liens, mortgages, security interests or other encumbrances against the Licensed Technology and the Licensed Technical Information or any interests therein"; "No share, interest, assignment, license, option or other right to any or all of the Licensed Technology and the Licensed Technical Information has been

transferred, assigned, or granted to any other party") in and to the asserted patents at the time of the license agreement. (A324 ¶ 8.)

Moreover, PhoenixArts had the apparent authority to grant an exclusive, worldwide license. (A322 ¶ 3 (granting an exclusive license in the Territory); A320 ¶ 1(t) (defining "Territory" to mean worldwide).) PhoenixArts also had the apparent authority to grant the right to enforce the patents against infringers. (A328 ¶ 15 ("Licensee shall have the right to commence, prosecute or institute any suit, action or proceeding in furtherance of any claim(s) for infringement or imitation of the Licensed Technology or Licensed Technical Information.").)

Importantly, PhoenixArt's apparent authority came with Anderson's express knowledge and consent since Anderson himself signed the license agreement on behalf of PhoenixArts as that LLC's only member. (A335 (providing the notary public's acknowledgement of Anderson's signature), A881–A882, A885.)

Anderson was in a position to know (as the sole inventor listed on the patents at issue), and he warranted on behalf of PhoenixArts that the LLC held the entire right, title, and interest in and to the patents. (*See* A324 ¶ 8.) As such, PhoenixArts was the owner of the patents at the time of the license agreement. Any other result means that Anderson affirmatively misrepresented the ownership status of the invention and patents in the license agreement (and also to the bankruptcy court as discussed below).

22

(b)   Under Tennessee law, PhoenixArts still exists

Under Tennessee law, "[a]n LLC administratively dissolved *continues its existence* but may not carry on any business except that necessary to wind up and liquidate its business and affairs under section 48-245-501 and notify claimants under section 48-245-502." Tenn. Code. Ann. sec. 48-245-302(c) (emphasis added).

PhoenixArts, LLC is a limited liability company organized under the laws of Tennessee. (A880.) In his complaint, Anderson alleged that he currently holds the rights to the asserted patents, he was the sole owner and president of PhoenixArts, and all right, title, and interest in and to the asserted patents reverted to Anderson when PhoenixArts, LLC was dissolved:

> 13. Mr. Anderson currently holds the rights to the Anderson Patents.
>
> 14. Mr. Anderson was the sole owner and President of a Tennessee-based limited liability company, PhoenixArts, LLC ("PhoenixArts"), which was granted the right to license the Anderson Patents by Mr. Anderson. Upon the dissolution of PhoenixArts, all right, title, and interest in and to the Anderson Patents reverted to Mr. Anderson.

(A133 ¶¶ 13–14.)

However, the members of the LLC did not file articles of termination. (*See* A880–A889.) Rather, Tennessee administratively dissolved PhoenixArts twice because the LLC did not file annual reports, and PhoenixArts was not reinstated

after the second dissolution. (A880–A889.) Accordingly, the LLC still exists since an administratively dissolved LLC continues its existence under Tennessee law. Tenn. Code. Ann. sec. 48-245-302(c). Because the LLC currently exists, its rights, title, and interest in and to the patents could not have automatically reverted to Anderson upon its "dissolution."

As such, PhoenixArts, LLC still exists and presently owns the entire right, title, and interest in and to the patents. Therefore, Anderson has no standing to bring the current claims for patent infringement because he no longer owns the patents.

3.    <u>If the right, title, and interest in and to the patents was not transferred to PhoenixArts, then those rights remain with Anderson's bankruptcy estate since they were not disposed of by the estate</u>

Even if the right, title, and interest in and to the asserted patents was never transferred to PhoenixArts, LLC, then those rights remain with Anderson's bankruptcy estate since they were not disposed of by the estate because Anderson never disclosed the patents or the inventions as assets. (*See* A891–A934.)

"It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets," and that "duty of disclosure in a bankruptcy proceeding is a continuing one." *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 479 n. 5 (6th Cir. 2010)

24

(citation omitted). That is particularly true for a Chapter 13 debtor engaged in business who is required to file with the bankruptcy court and to provide to the U.S. Trustee periodic reports and summaries about the operation of his business. *See* 11 U.S.C. § 1304(c) ("A debtor engaged in business shall perform the duties of the trustee specified in section 704(a)(8) of this title."); 11 U.S.C. § 704(a)(8) ("The trustee shall – if the business of the debtor is authorized to be operated, file with the court [and] with the United States trustee . . . periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires.") A Chapter 13 debtor's "duty to disclose is a continuing one that does not end once the forms are submitted to the bankruptcy court; rather, a debtor must amend [his] financial statements if circumstances change. Full and honest disclosure in a bankruptcy case is crucial to the effective functioning of the federal bankruptcy system." *Tyler v. Federal Express Corp.*, 420 F. Supp.2d 849, 856 (W.D. Tenn. 2005), *aff'd*, 206 F. App'x 500 (6th Cir. Nov. 16, 2006).

Moreover, Section 541(a)(1) of the Bankruptcy Code "provides the general rule that property of the bankruptcy estate consists of all legal and equitable interests of the debtor in property as of the commencement of the case. . . ." *In re Seafort*, 669 F.3d 662, 666 (6th Cir. 2012), *citing* 11 U.S.C. § 541(a)(1)). "Property

of the estate" for purposes of Chapter 13 is defined even more broadly and includes, in addition to the property specified in section 541:

> (1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed . . . .; and

> (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed . . . .

*Id.* at 667, *quoting* "11 U.S.C. § 1306 (emphasis omitted). As a result, "§ 1306 adds to the 'property of the estate' property interests which arise post-petition" in Chapter 13 cases. *Id.* at 667. "This language makes clear that property of the type specified by § 541 that is acquired post-petition by a chapter 13 debtor, and not just post-petition income, becomes part of that debtor's chapter 13 estate." *Id.* at 669 (citation omitted)).

In the present case, it is undisputed that Anderson never disclosed his toy balloon invention in his original bankruptcy schedules or at any other point in the proceedings, even though he acknowledges that the idea or concept for this invention existed at the time he filed for Chapter 13 bankruptcy. (A916 ¶ 21; *id.* ¶ 33; A742–A743.) Likewise, it is undisputed that Anderson never amended his bankruptcy schedules or otherwise disclosed his patent applications, three U.S. patents issued in his name, or the more than $1.5 million in royalties he received as the sole member of PhoenixArts, LLC from the licensing of the patented technology. (A889, A894–A897; A689, A743; A156, A161, A167; A355–A378;

26

A402.) Moreover, although Anderson disclosed in his original schedules that he was operating a retail business called "PhoenixArts," he never filed any of the required periodic reports or summaries of the operation of any such business. (A894–A897, A932.) *See* 11 U.S.C. §§ 704(a)(8), 1304(c).

Because Anderson never disclosed his U.S. patents or any related technological or licensing rights in his bankruptcy proceedings, those assets were never administered nor abandoned and, therefore, still belong to his bankruptcy estate. 11 U.S.C. § 554(d) ("Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate."); *see, e.g., Auday v. Wet Seal Retail, Inc.*, 698 F.3d 902, 904–05 (6th Cir. 2012); *In re Cundiff*, 227 B.R. 476, 478-79 (B.A.P. 6th Cir. 1998). This means that Anderson has no standing or legal capacity to pursue any related claims against TOL in the current lawsuit. *Auday*, 698 F.3d at 904. Again, if Anderson does not own the patents, then he cannot bring a lawsuit claiming rights under those patents.

4. <u>If PhoenixArts does not own the patents, then Anderson has unclean hands and is also judicially estopped from personally asserting any rights to the patents because Anderson never disclosed the asserted patents or the related royalty income to his bankruptcy trustee</u>

Anderson is not entitled to equity because he has not been equitable, and he came to the district court with unclean hands concerning the three asserted patents:

> The guiding doctrine in this case is the equitable maxim that "he who comes into equity must come with clean hands." This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith.

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).

Here, during his Chapter 13 bankruptcy plan Anderson did not disclose the asserted patents, the applications that resulted in those patents, the corresponding foreign patent applications, or approximately $1.5 million in patent royalties he received while cheating his creditors out of more than $42,600. (*See* A5, A6, A16 n.15, A902–A903.) Nevertheless, he was required to disclose those assets under 11 U.S.C. § 1306(a). In the district court's view, any reasonable explanation for this was not self-evident. (A16 n.15.) Yet Anderson was granted equitable relief based

28

on the same patents that he concealed from the bankruptcy trustee and his creditors.

Consequently, since Anderson's conduct was inequitable and since that conduct related to the patents Anderson asserted against TOL in the complaint and for the preliminary injunction, Anderson should be barred from receiving equitable relief because of his unclean hands.

In the same way, Anderson is judicially estopped from personally prosecuting for his own benefit any claims related to the assets that he failed to disclose in his bankruptcy proceedings. "In short, to support a finding of judicial estoppel," courts often require proof that: (1) the debtor "assumed a position that was contrary to one that" the debtor "asserted under oath in the bankruptcy proceedings; (2) the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition; and (3) the debtor's omission "did not result from mistake or inadvertence." *White*, 617 F.3d at 478 (applying Sixth Circuit law); *see also New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) (applying these factors: (a) whether party's later position is clearly inconsistent with its earlier position; (b) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; (c) whether the party seeking to

assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped).

Where the defendant comes forth with evidence showing (1) the debtor's failure to disclose such assets in his sworn bankruptcy schedules or any amendments to the schedules, (2) the bankruptcy court's adoption of the debtor's position by confirming his Chapter 13 reorganization plan and/or discharging the debtor without such assets having been administered or abandoned, (3) the debtor's knowledge of these assets, and (4) the debtor's motivation to conceal those assets from his creditors, then the burden shifts to the debtor to "point out evidence that shows an absence of bad faith," such as any attempts to correct his omission, or that his "omission resulted from inadvertence or mistake that was not intentional." *White*, 617 F.3d at 478 n.4; *see id*. at 474–75.

Because "judicial estoppel seeks to prevent parties from abusing the judicial process through cynical gamesmanship, the timing of [any corrective efforts by the debtor] is also significant." *Id*. at 480; *see also id*. at 481 ("We will not consider favorably the fact that [debtor] updated her initial [bankruptcy] filings after the motion to dismiss was filed" by the defendants in a separate lawsuit, because "[t]o do so would encourage gamesmanship"); *id*. at 481–82 ("'Allowing [a debtor] to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should

consider disclosing assets only if he is caught concealing them.'" (citation omitted)); *id*. at 482 n.10 (barring plaintiff from prosecuting lawsuit for previously undisclosed claim, "even though the result prevented recovery by bankruptcy creditors," because this "would only diminish the necessary incentive to provide the bankruptcy court with a truthful disclosure of the debtor's assets").

In the present case, Anderson neither disclosed his underlying invention in his original bankruptcy schedules nor attempted to amend those schedules to disclose his related patents, licensing rights, or royalties. He also did not file any of the required reports regarding the operation of his PhoenixArts business. As a result, the bankruptcy court confirmed Anderson's Chapter 13 reorganization plan, discharged him, and closed his bankruptcy proceedings without any knowledge of these assets. (A897–A900.) Anderson was obviously aware of these assets at the time, particularly because all of the U.S. patents at issue were applied for and issued in his name. (A156, A161, A167.) Since Anderson received through PhoenixArts, LLC around $1.5 million in royalties during the pendency of his bankruptcy proceedings, he had a motivation to hide these royalties and related assets from his bankruptcy creditors. (A355–A378; A402.) *See, e.g., White*, 617 F.3d at 479 ("It is always in a Chapter 13 petitioner's interest to minimize income and assets" (citation omitted)). Under the circumstances, it is difficult to appreciate how Anderson could argue that he, in good faith, mistakenly or inadvertently failed

31

to disclose those royalties and assets in his bankruptcy proceedings. Indeed, the district court's view was that any reasonable explanation of this was not self-evident. (A16 n.15.) As a result, Anderson should be judicially estopped from now asserting any related claims in this lawsuit. *See, e.g., Dickerson v. Fed. Express Corp.*, 2010 U.S. Dist. LEXIS 22742, *11 (W.D. Tenn. Mar. 10, 2010) ("Plaintiff's assertion that he was unaware of the Chapter 13 disclosure requirements does not preclude the application of judicial estoppel."); *Tyler*, 420 F. Supp.2d at 859 (same); *Bohanan v. Bridgestone*, 2007 U.S. Dist. LEXIS 26615, *24 (M.D. Tenn. Apr. 10, 2007) (same).

5.  <u>Anderson has no standing to bring his non-patent claims (for breach of contract, fraud, or a declaration of rights under the license agreement) since he was not a party to the license agreement</u>

In his complaint, Anderson brought claims against TOL for breach of contract and fraud as well as for a declaratory judgment that the contract was terminated. (A146–A148; A151.) These claims were based on the February 22, 2003 license agreement between PhoenixArts, LLC and Overbreak, LLC as well as duties under that license agreement. (A145–A146 (requesting a declaration of rights under the license agreement); A146–A148 (alleging breach of the royalty obligations and confidentiality restrictions under the license agreement); A151 (alleging fraud under the royalty obligations of the license agreement).) They also

served as some of the bases for Anderson's motion for a temporary restraining order and preliminary injunction (A310–A311 (arguing a likelihood of success on the claim for breach of contract and breach of the confidentiality provision of the license agreement), although the district court ultimately granted the preliminary injunction based only on the patent claims (A19 n.18).

Nonetheless, Anderson now asserts that he is not a party to the license agreement. (A539–A541, A543–A544.) Moreover, in the complaint Anderson never alleged to have stepped into the shoes of PhoenixArts, LLC with respect to the rights and duties under the license agreement. Although Anderson brought claims based on rights (and for a declaration of rights) under that license agreement, Anderson did not "clearly and specifically set forth facts" sufficient to establish an injury based on the license agreement that is fairly traceable to TOL's conduct. See *Whitmore*, 495 U.S. at 155–56; *Lujan*, 504 U.S. at 560. Simply put, Anderson cannot vindicate rights, or seek a declaration of rights, under an agreement to which he admits he was not a party.

Under Anderson's own version of the facts, there was never any agreement between TOL and Anderson. (A541 ("Mr. Anderson is not a party to the Agreement, nor is TOL.").) Consequently, Anderson cannot show an injury-in-fact, and he has not established standing to bring these claims for breach of contract, fraud, and declaratory relief under the license agreement.

33

**B.**     **If Anderson has standing, then the district court abused its discretion in granting the preliminary injunction and finding contempt of that preliminary injunction**

The district court abused its discretion by improperly extending the preliminary injunction to reach activities outside of the United States, improperly granting equitable relief to Anderson in view of Anderson's inequitable conduct before the bankruptcy court, by basing its conclusion on patent validity only on the statutory presumption of validity, and by finding infringement likely without construing the patents' claims or comparing them to the accused products.

1.     Legal standard and standard of review

On an appeal from the grant of a preliminary injunction, the Federal Circuit reviews the district court's ultimate decision to grant a preliminary injunction for abuse of discretion. *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1373 (Fed. Cir. 2012). If the court's decision is based upon an issue of law, the Federal Circuit reviews that issue de novo. *Sciele Pharma, Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012). "To constitute an abuse of discretion, a district court decision must either make a clear error of judgment in weighing relevant factors or exercise discretion based upon an error of law." *Id.*

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence

34

of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is an "extraordinary remedy" that will only be issued "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Thus, for example, it is inappropriate to issue a preliminary injunction based only on a possibility of irreparable harm. *Id*. (holding that the possibility standard "is too lenient"). Accordingly, the harm cannot be speculative.

The traditional rules of equity apply equally to injunctive relief under the patent laws. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006) (holding so in the context of a permanent injunction).

Here, the district court granted the preliminary injunction based only on the patent infringement issues alleged by Anderson. (A19 n.18 ("[F]or purposes of Rule 65, the court does not address the likelihood that Anderson will succeed on the merits of his claims other than the patent infringement claims.").) Consequently, this appeal brief does not analyze Anderson's other alleged claims with respect to the preliminary injunction.

In the preliminary injunction, the district court enjoined TOL and the other affected persons:

> from infringing any of the Anderson Patents, using plaintiff Anderson's confidential information and licensed technology in any form or fashion, selling or offering for sale the patented products or interfering with Anderson's rights in the Anderson

35

Patents or the licensed technology in any way, pending further order of the court.

(A1–A2.)

2.    The district court improperly extended the preliminary injunction to reach activities outside of the United States

First, the district court abused its discretion by improperly extending the preliminary injunction to reach activities outside of the United States, even though a U.S. patent provides no protection against acts outside of the United States. Again, the district court granted the preliminary injunction based only on the patent infringement issues alleged by Anderson. (A19 n.18.)

(a)    U.S. patent rights have no reach outside of the United States

A U.S. patent provides no protection against acts taking place outside of the United States. *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 650 (1914) ("The right conferred by a patent under our law is confined to the United States and its Territories."); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1375 (Fed. Cir. 2005) ("It is well-established that the reach of [title 35,] section 271(a) is limited to infringing activities that occur within the United States."). This territorial limitation is also apparent in the statute that provides a remedy for patent infringement:

Except as otherwise provided in this title [35 USC], whoever without authority makes, uses, offers to sell, or sells any patented invention, *within the United States* or imports *into the*

36

> *United States* any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a) (emphasis added). Elsewhere in the statute, United States is defined to mean the U.S. as well as its territories and possessions:

> The terms "United States" and "this country" mean the United States of America, its territories and possessions.

35 U.S.C § 100(c).

Accordingly, under U.S. patent law, Anderson's U.S. patent rights provide no protection against acts taking place outside the United States, such as in the United Kingdom. Indeed, Anderson did not allege that anyone made, used, offered to sell, or sold any patented invention within the United States or imported into the United States any patented invention. To the contrary, the evidence submitted by Anderson claimed that the accused products were made in China and imported by Alive Products Ltd., a U.K. company, into England where they were sold at Hamleys, an English toy store. (A1014; A1032; A1064.) Even if Anderson were to argue that he received an offer for sale from the email offering to ship a HOVERDISC^TM toy to him from England, that offer came from The Hamleys Group, not TOL or Alive Products Ltd. (A1030.)

The preliminary injunction prohibited TOL from selling the patented products. (A1–A2.) Since the toy balloons are not patented outside of the United States, they are only "patented products" when those products are made, used,

sold, or offered for sale within the United States. 35 U.S.C. §§ 100(c), 271(a); *Dowagiac*, 235 U.S. at 650; *MEMC Elec. Materials*, 420 F.3d at 1375. Therefore, products manufactured in China and imported into England for sale in England cannot fall within the scope of the preliminary injunction because they are not patented products under U.S. law.

Furthermore, Anderson did not identify any corresponding U.K. patents. As such, presumably everyone in England (as well as the entire world beyond the U.S.) is free to sell knock-offs of Anderson's U.S.-patented device because he has no patent rights outside of the United States.

As such, there can be no patent infringement or interference with Anderson's patent rights because those rights do not exist outside of the United States.

(b)    The preliminary injunction issued by the district court was nationwide, not worldwide, in scope

The scope of an injunction is generally nationwide. *Waffenschmidt v. Mackay*, 763 F.2d 711, 716 (5th Cir. 1985) ("The mandate of an injunction issued by a federal district court runs nationwide."), *citing Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932) ("The decree was binding upon the respondent . . . throughout the United States.")).

Moreover, when an injunction issues with respect to a patent, such injunctions may only prevent the violation of a patent right:

> The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable.

35 U.S.C. § 283.

Accordingly, while an injunction under § 283 may reach activities outside of the U.S., such an injunction must be to prevent infringement of a United States patent. *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1366–1367 (Fed. Cir. 1998). When such an injunction does not prevent infringement of a United States patent, it is "a prohibited extra-territorial application of American patent law." *Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 903 F.2d 1568, 1578 (Fed. Cir. 1990) (holding that restrictions to foreign-made machines were "a reasonable and permissible endeavor to prevent infringement in the United States and not a prohibited extra-territorial application of American patent law" but only since the machines were to be used in the U.S.).

Applying those principals, the Federal Circuit in *Spine Solutions* held that the district court abused its discretion by imposing restraints on the defendant's activities outside of the United States. *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1320 (Fed. Cir. 2010). In that case, the defendant was selling products overseas, and the court found that "overseas sales of the

[accused] products cannot infringe any U.S. patent, and there is little risk that the infringing devices will be imported." *Id*. Because of that, the Federal Circuit directed the district court to vacate the extraterritorial portion of the injunction. *Id*.

Here, there is little risk that the products from England would be imported into the United States because, based on Anderson's submitted evidence, the cost to do so is more than six-and-a-half times the purchase price of the product in England. (A1030 (stating that shipping costs would be £72.42 for the product, which costs just £13.00).)

Moreover, as indicated above, the patent rights underlying the injunction are territorially limited to the United States because Anderson's U.S. patent cannot reach beyond the U.S. borders. 35 U.S.C. §§ 100(c), 271(a); *Dowagiac*, 235 U.S. at 650; *MEMC Elec. Materials*, 420 F.3d at 1375.

Accordingly, an appropriate preliminary injunction would not be worldwide in scope, and would not reach conduct taking place outside of the United States because there can be no violation of patent rights outside of the U.S. If the injunction did reach the conduct alleged by Anderson (manufacturing in China and sales in England without any making, using, selling, or offering for sale in the U.S.), it would be a prohibited extra-territorial application of American patent law. Therefore, it was an abuse of discretion for the district court to apply the preliminary injunction to activities taking place outside of the United States.

3.    <u>The district court granted equitable relief to Anderson despite Anderson's inequitable conduct before the bankruptcy court</u>

The district court also abused its discretion by improperly granting equitable relief to Anderson in view of Anderson's inequitable conduct before the bankruptcy court. For the reasons discussed in detail above, Anderson has unclean hands and also should be judicially estopped from personally asserting any rights to the patents because Anderson never disclosed the asserted patents or the related royalty income to his bankruptcy trustee. In view of that inequitable conduct, it was an abuse of discretion for the district court to grant Anderson the equitable relief of a preliminary injunction.

4.    <u>The district court based its conclusion on patent validity only on the statutory presumption of validity and failed to construe the patents' claims or compare them to the accused products</u>

The district court also abused its discretion by basing its conclusion on patent validity only on the statutory presumption of validity and by failing to construe the patents' claims or compare them to the accused products when determining the issue of patent infringement for purposes of the preliminary injunction. This is particularly so since, in the district court's view, TOL was not a party to the license agreement or a successor to Overbreak's interest in the license

agreement. (A13). That would presumably make TOL an unrelated third party, accused of patent infringement.

(a)     The district court did not consider the evidence of invalidity and relied only on the statutory presumption of validity

The presumption of validity does not relieve a patentee seeking a preliminary injunction "from carrying the normal burden of demonstrating that it will likely succeed on all disputed liability issues at trial, even when the issue concerns the patent's validity." *New Eng. Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882 (Fed. Cir. 1992). Moreover, the roles of persuasion are flipped at the preliminary injunction stage:

> Instead of the alleged infringer having to persuade the trial court that the patent is invalid, at this stage it is the patentee, the movant, who must persuade the court that, despite the challenge presented to validity, the patentee nevertheless is likely to succeed at trial on the validity issue.

*Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009).

Thus, while the statutory presumption of validity is sufficient if there is no challenge to the patent's validity, it is not sufficient where there is a challenge to validity:

> Before trial, when the question of validity arises at the preliminary injunction stage, the application of these burdens and presumptions is tailored to fit the preliminary injunction context. To begin, the patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation. Thus, if a patentee moves for a preliminary

injunction and the alleged infringer does not challenge validity, the very existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue.

If, instead, the alleged infringer responds to the preliminary injunction motion by launching an attack on the validity of the patent, the burden is on the challenger to come forward with evidence of invalidity, just as it would be at trial. The patentee, to avoid a conclusion that it is unable to show a likelihood of success, then has the burden of responding with contrary evidence, which of course may include analysis and argument.

*Id.* (citations omitted).

Here, TOL provided evidence of the invalidity of the asserted patents. That evidence was in the form of Anderson's own verified statements, namely that practicing the patents would require proprietary knowledge. (A512–A515, A516–A517.)

Specifically, Anderson's verified statement is that TOL breached paragraph 19 of the license agreement by committing patent infringement. (A130–A131 ¶¶ 4–5.) Paragraph 19 forbids the disclosure of certain confidential information, but it excludes "information that is generally available to the public." (A330 ¶ 19(a).) However, producing and selling a patented product, even if infringing, does not require confidential information.

That is, part of the bargain for receiving a patent is the public disclosure of the issued patent, which promotes innovation and fulfills the constitutional mandate of the patent system:

> The federal patent system thus embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years. '[The inventor] may keep his invention secret and reap its fruits indefinitely. In consideration of its disclosure and the consequent benefit to the community, the patent is granted.'

*Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 150–51 (1989); *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002) ("[E]xclusive patent rights are given in exchange for disclosing the invention to the public."); *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1336–37 (Fed. Cir. 2005) ("The purpose of this [enablement] requirement is to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." (internal quotation marks omitted)).

Moreover, Section 112 of the Patent Laws requires a patent to include a thorough written description of the invention, to enable a person of ordinary skill in the art to practice the invention, and to disclose the best method of carrying out the invention:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, *to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.*

44

35 U.S.C. § 112, 1st para. (2011) (emphasis added).

An issued patent is presumed valid. 35 U.S.C. § 282. As such, an issued patent is presumed to meet the written description, enablement, and best mode requirements of § 112. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986) ("[T]he presumption of validity goes to validity of the patent in relation to the patent statute as a whole."). Consequently, the law presumes that an issued patent has made full public disclosure of the invention in exchange for the limited monopoly granted to the patent holder.

Even if previously secret, disclosure of an invention in an issued patent terminates any trade secret protection that existed. *Rhone-Poulenc Agro Sa v. Dekalb Genetics Corp.*, 272 F.3d 1335, 1359 (Fed. Cir. 2001) ("Typically, the publication of a patent terminates all trade secret rights."), *vacated on other grounds*, *DeKalb Genetics Corp. v. Bayer CropScience, S.A.*, 538 U.S. 974 (2003); *Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 99 (6th Cir. 1975) ("If a trade secret is patented there is no further right to secrecy. The patent is a legal disclosure with the right to a limited, temporary monopoly granted as the reward for disclosure.").

Here, the three patents asserted by Anderson have been public information since at least the issue dates of the patents. The earliest of those dates is December 9, 2003, and the latest is May 29, 2007. (A156, A161, A167.) As issued patents, they also have presumptively met the written description, enablement, and best

45

mode requirements, thereby allowing a person of ordinary skill in the art to practice the invention. 35 U.S.C. §§ 112, 282. Therefore, to argue that the patents would require proprietary knowledge to practice the invention is to argue that the patents are invalid. *Id.*

Moreover, the technology covered by the patents is straightforward: a toy balloon with a couple of structural members. (*See* A156–A174.) It is unclear what proprietary information would be needed to produce such a balloon. In any event, Anderson does not identify any such information, although it was his burden to do so. *Litton Systems, Inc. v. Sundstrand Corp.*, 750 F.2d 952, 958 (Fed. Cir. 1984) (upholding the district court's determination that the plaintiff "failed to carry its basic burden of pleading and showing facts that establish the existence of subject matter capable of protection as a trade secret in the manner provided for in the requested injunction").

Although the practice of the invention may have required proprietary information before the patents issued, that can no longer be the case. *Scharmer*, 525 F.2d at 99.

Accordingly, producing and selling the patented toy balloon does not require confidential information because the information on how to make and use the inventions is generally available to the public through the issued patents.

Because TOL provided this evidence of invalidity in the district court, Anderson could not rely on the presumption of validity to meet his burden for showing that he is entitled to a preliminary injunction. *New Eng. Braiding*, 970 F.2d at 882 ("[T]he presumption of validity is not evidence which can be 'weighed' in determining likelihood of success."); *Titan Tire*, 566 F.3d at 1377 ("The patentee, to avoid a conclusion that it is unable to show a likelihood of success [after the alleged infringer launches an attack on the validity], then has the burden of responding with contrary evidence"). Yet, Anderson did not respond with any contrary evidence, and the district court based its conclusion on patent validity only on the statutory presumption in 35 U.S.C. § 282. (A18–A19 (reciting law about the statutory presumption of validity and stating without analysis that "TOL has not presented a viable argument that the Patents are invalid").) To do so was an abuse of discretion in view of the Federal Circuit law set forth in *New Eng. Braiding* and *Titan Tire*.

> (b) <u>The district court failed to construe the patents' claims or compare any of them to the accused products</u>

Regardless of the validity issue, in granting the preliminary injunction and in finding contempt of that injunction the district court did not perform any of the steps set forth by the Federal Circuit to determine patent infringement.

47

"In order to establish a reasonable likelihood of success in a patent infringement case, a party must show that he has a likelihood of establishing title, validity and infringement." *Penn Fabrication (U.S.A.) v. Soulbella Enters.*, 48 U.S.P.Q.2d (BNA) 1319, 1319, 1998 U.S. Dist. LEXIS 17348, *2 (C.D. Cal. 1998); *accord Conair Group v. Automatik Apparate-Maschinenbau Gmbh & Automatik Mach. Corp.*, 944 F.2d 862, 865 (Fed. Cir. 1991) ("Demonstrating a probability of success on the merits includes the requirement that the patentee make a showing of a likelihood of proving infringement."); *Lund Indus. v. Go Indus.*, 938 F.2d 1273, 1276 (Fed. Cir. 1991) (holding that "the district court's summary conclusion of infringement cannot stand" where the district court did not follow the proper infringement analysis).

A two-step analysis is used to determine whether a product infringes a claim of a United States patent. *Cybor Corp. v. Fas Technologies, Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). First, the scope and meaning of the claim is determined. *Id*. Second, the construed claim is compared to the allegedly infringing device to determine whether the device embodies every limitation of the claim. *Id*.

Yet, the district court did not construe any of the thirty-nine patent claims asserted by Anderson, and the district court did not compare any of the claims to the accused product. Indeed, the district court could not have compared the

accused product to the claims since there is not a clear depiction or exemplar of the accused product in the record. (*See* A155, A1032–A1033, A1058, A1061.)

Instead, the district court concluded that, since TOL argued that it has a license under the licensing agreement as Overbreak's successor, it must be an infringer if it is found to not be the licensee. (A19.) Yet, TOL has not conceded that its products infringed the asserted patents. Furthermore, a licensee is not automatically an infringer if not for its status as a licensee. *See, e.g., Medtronic Inc. v. Boston Sci. Corp.*, 695 F.3d 1266, 1274 (Fed. Cir. 2012) (recognizing that a licensee may seek a declaratory judgment of non-infringement and of no consequent liability under the license).

As such, it was an abuse of discretion for the district court to conclude that TOL must be an infringer if it is not the licensee, particularly since the district court did not perform any claim analysis. Indeed, the district court could not have even rudimentarily compared the accused product to the claims since there is not a clear depiction or exemplar of the accused product in the record.

## C.     <u>Since the district court abused its discretion in granting the preliminary injunction, the civil contempt order must be reversed</u>

Since the district court abused its discretion in granting the preliminary injunction (as noted above), the civil contempt order must be reversed. *United States v. United Mine Workers*, 330 U.S. 258, 295, (1947) ("The right to remedial

relief falls with an injunction which events prove was erroneously issued . . . and a fortiori when the injunction or restraining order was beyond the jurisdiction of the court.").

## VIII. CONCLUSION AND RELIEF SOUGHT

Anderson does not own the asserted patents because PhoenixArts, LLC owns the patents. So, he does not have standing to sue for patent infringement. Specifically, Anderson, as the only member of the LLC, represented that all right, title, and interest in and to the patents was held by PhoenixArts at the time of the license agreement that is the subject of the district court case. And PhoenixArts still exists under Tennessee law because it was administratively dissolved and never terminated. Consequently, PhoenixArts still owns the patents.

Alternatively, if Anderson did not transfer the right, title, and interest in and to the patents to PhoenixArts, then those rights remain with Anderson's bankruptcy estate since they were not disposed of by the estate during his personal bankruptcy because Anderson never disclosed the three patents or the more than $1.5 million in related royalty income to his bankruptcy trustee. When assets are not disclosed to a bankruptcy trustee, they still belong to the bankruptcy estate.

Moreover, if PhoenixArts does not actually own the patents, then Anderson has unclean hands and is also judicially estopped from personally asserting any rights to the patents because Anderson never disclosed the asserted patents or the

related royalty income to his bankruptcy trustee. Anderson benefitted from that misrepresentation by cheating his creditors out of more than $42,000 while Anderson received more than $1.5 million in royalties under the license agreement between PhoenixArts and Overbreak.

Furthermore, it was an abuse of discretion for the district court to grant equitable relief to Anderson (in the form of the preliminary injunction) in view Anderson's inequitable conduct before the bankruptcy court just discussed. That conduct pertained to the same patents asserted by Anderson in the district court case.

If Anderson has standing, then the district court abused its discretion by extending the preliminary injunction to reach activities outside of the United States. The district court granted the preliminary injunction based only on the patent infringement issues alleged by Anderson, but U.S. patent rights have no reach outside of the United States. Consequently, there can be no patent infringement or interference with Anderson's patent rights for extraterritorial activities because those rights do not exist outside of the United States. Also, there is little risk that the products from England would be imported into the United States because the shipping costs would make the product cost prohibitive.

It was also an abuse of discretion for the district court to base its conclusion on patent validity only on the statutory presumption of validity when TOL

presented evidence that the patents were invalid for failing to meet the requirements of 35 U.S.C. § 112. Federal Circuit law states that the statutory presumption of validity is not sufficient for purposes of a preliminary injunction analysis if there is a challenge to the patent's validity. Yet, Anderson presented no rebutting evidence.

Additionally, it was also an abuse of discretion for the district court to make a conclusion on patent infringement for the preliminary injunction and contempt orders without construing the patents' claims or comparing them to the accused products, even if rudimentarily. Instead, having concluded that TOL was not a party to the license agreement or a successor to Overbreak's interest in the license agreement, the district court stated summarily that patent infringement was likely.

In view of these issues, the civil contempt order incident to the preliminary injunction was improperly granted by the district court and should be reversed.

Accordingly, TOL requests that the preliminary injunction be dissolved and the order finding contempt of the preliminary injunction be reversed. TOL also requests that the underlying action be dismissed because Anderson lacked standing to bring his claims against TOL. Furthermore, TOL asks the Court to refer the matter to the United States Attorney to investigate Anderson's inequitable conduct before the bankruptcy court.

## IX.  CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

By signing below, the attorney submitting this brief certifies that the brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B). As determined by the word processing software used to prepare this brief, the brief contains 12,011 words, excluding the portions designated in Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b) to not count toward the limitation.

Respectfully submitted,

CISLO & THOMAS LLP

Dated: November 13, 2013

/s/ Daniel M. Cislo
Daniel M. Cislo, Esq.

Attorneys for Defendant-Appellant
TOL, INC.

## **CERTIFICATE OF SERVICE**

I electronically filed the foregoing document with the clerk of court for the United States Court of Appeals for the Federal Circuit, using the electronic case filing system of the court. The Court's Electronic Filing System caused the document to be served on:

> Paige Waldron Mills
> Lucas R. Smith
> BASS, BERRY & SIMS, PLC
> 150 Third Avenue South, Suite 2800
> Nashville, TN 37201

Dated: November 13, 2013          /s/ Daniel M. Cislo
                                  Daniel M. Cislo

Exhibit 1

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| LLOYD RANDALL ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:12-1312 |
| | ) | Judge Trauger |
| TOL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PRELIMINARY INJUNCTION**

Based upon the filings in this case and an evidentiary hearing held on February 7, 2013, the court finds that the plaintiff has established that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tip in his favor, and that in injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Obama For America v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012). The detailed reasons for these findings will be explicated in a memorandum decision to be issued by the court.

It is hereby **ORDERED** that, conditioned upon the posting of a $50,000 cash, surety or property bond by the plaintiff, defendant TOL, Inc. and Overbreak, LLC and their officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or participation with them are hereby **PRELIMINARILY ENJOINED** from infringing any of the Anderson Patents, using plaintiff Anderson's confidential information and licensed technology in any form or fashion, selling or offering for sale the patented products or interfering with Anderson's rights in the Anderson Patents or the

1

licensed technology in any way, pending further order of the court.

So **ORDERED** on the 7th day of February 2013 at 6:10 p.m.

ENTER this 8th day of February 2013.

 

 

ALETA A. TRAUGER
U.S. District Judge

2

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **LLOYD RANDALL ANDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:12-cv-01312** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **TOL, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM</u>**

Plaintiff Lloyd Randall Anderson has filed a Motion for Temporary Restraining Order and Preliminary Injunctive Relief ("Motion for Preliminary Injunction"), to which the defendant, TOL, Inc. ("TOL"), filed a Response in opposition (Docket No. 23), and Anderson filed a Reply (Docket No. 34).  TOL has filed a Motion to Dismiss or Transfer (Docket No. 16), to which Anderson filed a Response in opposition (Docket No. 26), and TOL filed a Reply (Docket No. 40).  Anderson has also filed a Motion for Leave to File Motion for Partial Summary Judgment (Docket No. 33), to which TOL has filed a Response in opposition (Docket No. 41).

On February 7, 2013, the court held a preliminary injunction hearing ("PI Hearing").  At the conclusion of that hearing, the court ruled from the bench and issued a preliminary injunction against TOL and Overbreak, LLC.  This Memorandum further explains the court's reasoning for that decision.  Furthermore, for the reasons explained herein, the Motion to Dismiss or Transfer and the Motion for Leave to File a Motion for Partial Summary Judgment will both be denied without prejudice.

# BACKGROUND

I.    <u>Factual Background</u>[1]

This case involves claims by an inventor, Lloyd Randall Anderson, who claims that TOL is liable to him for patent infringement, breach of contract, and fraud.  Anderson was the inventor of patented technology for rigid helium balloons that Overbreak, LLC ("Overbreak") utilized to create a popular children's toy called the "HoverDisc."

On February 25, 2002 – before Anderson had applied for any patents concerning the rigid helium balloons – Anderson filed a voluntary petition for Chapter 13 Bankruptcy.  *See In Re Anderson*, No. 3:02-bk-02305 (Bankr. M.D. Tenn. Feb. 25, 2002) ("Bankruptcy Case").[2]

On February 5, 2003, Anderson filed Articles of Organization for "PhoenixArts, LLC" ("PhoenixArts"), a Tennessee limited liability company for which Anderson served as the President and sole owner.  (*See* O'Brien Decl. II, at Ex. 1 (pp. 10-11); Anderson Decl. ¶ 4; Verified Compl. ¶ 14).  On February 14, 2003, Anderson filed a patent application with the United States Patent and Trademark Office ("USPTO") in his own name, seeking a patent for his

---

[1]The parties presented witnesses and introduced documents into evidence at the PI Hearing.  (*See* Docket Nos. 37 (list of witnesses and exhibits) and 39 (PI Hearing transcript)).  The parties have also introduced various other sworn materials, including: (1) Anderson's Verified Complaint (Docket No. 1) (with associated attachments); (2) a declaration from Dayne Sieling in support of TOL's Motion to Dismiss or Transfer (Docket No. 18, Attachment 1) ("Sieling Decl. I"); (3) a declaration from Anderson in support of his request for a preliminary injunction (Docket No. 19) ("Anderson Decl."); (4) declarations from Sieling and Sean D. O'Brien in support of TOL's Response in opposition to Anderson's request for preliminary injunctive relief (Docket No 23, Exs. 1 ("Sieling Decl. II") and 2 ("O'Brien Decl. I")); and (5) a declaration from O'Brien in support of TOL's Reply concerning the Motion to Dismiss or Transfer (Docket No. 40) ("O'Brien Decl. II").  Unless otherwise noted, this background section is based on the sworn materials and testimony presented to the court.

[2]TOL filed a copy of the bankruptcy court docket and certain entries contained therein as an exhibit to the Second O'Brien Declaration.  (*See* O'Brien Decl. II, Ex. 2.)  The court takes judicial notice of these materials.

rigid helium balloon invention (hereinafter, "838 Patent Application").  (*See* Verified Compl., Ex. B, at p. 1.)  On February 22, 2003, PhoenixArts entered into a License Agreement with Overbreak, in which PhoenixArts purported to license the 838 Patent Application and all related applications and patents to Overbreak, in return for Overbreak's promise to pay PhoenixArts royalties based on its "Net Sales" of the HoverDisc.  (Docket No. 5 (filed under seal) ("License Agreement").)  The USPTO ultimately issued the 838 Patent in Anderson's name on December 9, 2003 ("838 Patent").  (Verified Compl., Ex. B, at p. 1.)

On August 19, 2003, Anderson filed a follow-on patent application ("151 Patent Application"), which the USPTO granted and issued on May 29, 2007 ("151 Patent").  (*Id.*, Ex. B, at p. 12.)  On November 12, 2003, Anderson applied for a patent related to the 838 Patent (hereinafter, "487 Patent Application"), which the USPTO granted and issued on February 6, 2007 ("487 Patent Application").  (*Id.*)

Anderson has claimed that he orally conveyed to PhoenixArts the right to sub-license the Patents – including, apparently, the right to sub-license Anderson's interest in the Patent Applications while they were pending.  (*See* Docket No. 19, Anderson Decl. ¶¶ 4-5; PI Hearing Transcript at 35:16-25; 98:24-99:5; Verified Compl. ¶¶ 14-16.)  Anderson has not stated when he entered into this alleged oral licensing agreement with PhoenixArts.  Anderson did not disclose the Patent Applications or the Patents at any time during the five-year duration of his Chapter 13 bankruptcy plan.

At any rate, pursuant to the License Agreement, Overbreak began manufacturing and selling HoverDiscs, which became a popular children's toy.  (Sieling Decl. I ¶ 4; Sieling Decl. II ¶ 4.)  Overbreak remitted approximately $1.5 million in royalties to Anderson through 2007.

(*Id.*)[3]  However, between 2005 and 2007, Anderson complained to Overbreak that it was failing to pay him sufficient royalties by improperly deducting non-allowable expenses from the quarterly payments, in violation of the License Agreement.  (Sieling Decl. I ¶ 4; Verified Compl. ¶¶ 23-32 (with associated exhibits); PI Hearing Exs. 2-7; PI Hearing Transcript 47:5-48:10, 49:16-56:9.)  It does not appear that Overbreak seriously disputes that, under the letter of the License Agreement, the expenses were not allowable.  (*See, e.g.*, PI Hearing, Ex. 5 (2/21/07 Letter from Elizabeth Risha to Paige Mills); PI Hearing Transcript 156:9-14; 157:2-5.)  Although Overbreak never paid the disputed amounts, Anderson did not pursue the dispute any further, at least at the time.  The parties vigorously dispute whether a March 1, 2007 demand letter sent by Anderson's counsel on his behalf terminated the License Agreement.  (*See* PI Hearing Ex. 7.)

In the interim, several relevant events occurred.  First, beginning in 2004, Overbreak procured foreign patents in Anderson's name in at least four foreign jurisdictions (collectively, "Foreign Patents") .  (PI Hearing Ex. 1; PI Hearing Transcript 44:9-46:19.)  However, without notice to PhoenixArts as required by the License Agreement, Overbreak permitted the Foreign Patents to expire, with no prospect of re-filing.  (*Id.*)  It appears that Anderson did not disclose the Foreign Patents in the Bankruptcy Case.  Second, PhoenixArts was administratively dissolved under Tennessee law on September 17, 2004, was reinstated on October 27, 2004, and was again administratively dissolved (for the second and last time) on August 19, 2005.  (O'Brien Decl.  II, Ex. 1 (p. 9).)

---

[3]The Sieling Declarations do not specify the time period in which Anderson received these royalty payments, but, for purposes of this Memorandum, the court will assume that Sieling is referring to the time period from the date of the License Agreement through the last royalty payment that Overbreak made to Anderson in 2006.

6

On June 15, 2007, Overbreak entered into an "Assignment of Rights" with TOL, a company consisting of the same shareholders, officers, assets, and operations as Overbreak. (Sieling Decl. II ¶ 5; Docket No. 28, Ex. A.) That assignment conveyed only Overbreak's rights – not Overbreak's liabilities – and did not reference the License Agreement, let alone purport to comply with certain specific conditions of assignment set forth therein.[4] Overbreak did not obtain Anderson's approval for this purported assignment. (PI Hearing Transcript 60:19-61:3.)

Unbeknownst to Anderson, Overbreak (and later TOL) continued to manufacture and sell HoverDiscs after March 2007, albeit in limited quantities. (Sieling Decl. I ¶ 6; PI Hearing Transcript 143:12-22.)

Anderson received his bankruptcy discharge on April 10, 2007, having completed the payments under his Chapter 13 Plan, and, on August 7, 2007, the bankruptcy court closed the Bankruptcy Case. (O'Brien Decl. II, Ex. 2.) Under the Plan, Anderson had paid to the Trustee, for the benefit of his creditors, $27,705. (*Id.*)

In approximately June 2012, Anderson, believing that he possessed unfettered ownership of the Patents, approached TOL (among other toy manufacturers) to explore the possibility of re-launching the HoverDisc. (PI Hearing Transcript at 64:25-67:5.) Anderson claims that, during these negotiations, TOL essentially acknowledged that it did not have any rights under the

---

[4]TOL now contends that, under a so-styled "*Nunc Pro Tunc* Agreement of Succession," executed after this lawsuit was filed, it actually succeeded to all of the rights *and liabilities* of Overbreak on June 15, 2007, expressly including all of Overbreak's rights and obligations under the License Agreement. (Sieling Decl. II, Ex. 2 (1/29/13 *Nunc Pro Tunc* Agreement); PI Hearing Transcript 23:23-24:11.) As explained herein, TOL has not established that this document has any retroactive legal effect for purposes of this lawsuit, and it does not comply with the License Agreement assignment provisions, in any case. (*See also* Docket No. 26, Anderson's Response in opposition to TOL's Motion to Dismiss or Transfer, at p. 6 n.6.)

License Agreement and required a license from Anderson before proceeding with a new product launch in early 2013.  (*Id.* at 69:10-70:1.)  However, TOL asserts that it was simply seeking to revise and update the existing License Agreement during its negotiations with Anderson.  (*See, e.g., id.* at 148:19-21; 175:22-177:13.)

In any event, after the parties had agreed on potential terms for a new license agreement, Anderson backed out of the prospective deal.  (*See* PI Hearing Exs. 9 (draft Letter of Intent) and 12 (10/16/12 email from Anderson to Sieling); PI Hearing Transcript 70:2-3 and 74:8-21.)  However, upon receiving Anderson's communication of withdrawal from the new licensing agreement, TOL responded by claiming that it had rights in the Patents all along and would proceed with its plans to re-launch the HoverDisc in early 2013.  (PI Hearing Ex. 13; PI Hearing Transcript 75:3-15.)

On December 20, 2012, Anderson filed this lawsuit, claiming that TOL was liable for breach of contract, fraud, and patent infringement, for which Anderson sought immediate injunctive relief in the form of a temporary restraining order ("TRO") and/or a preliminary injunction.[5]  On December 20, 2012, the court held a hearing ("TRO Hearing") and denied the request for a TRO.  On February 7, 2013, the court conducted the PI Hearing, at the conclusion of which the court enjoined TOL and/or Overbreak from continuing to manufacture, market, and sell the HoverDisc.[6]

## ANALYSIS

The parties vigorously dispute various basic facts of this case, including whether

---

[5]Anderson also asserts a separate count for a declaratory judgment.

[6]The injunction was conditioned on the posting of a bond by Anderson, which Anderson accordingly posted on February 14, 2013.  (Docket No. 38.)

Anderson and/or TOL are parties to the License Agreement, whether Anderson owns the Patents, and whether and when the License Agreement terminated. The court's consideration of some of these disputes impacts both the jurisdictional analysis (with respect to TOL's Motion to Dismiss or Transfer) and the merits of the underlying claims (with respect to Anderson's request for a preliminary injunction).

I.     **Parties to the License Agreement and Ownership of the Patents**

The original License Agreement was made between PhoenixArts as "Licensor" and Overbreak as "Licensee."

The License Agreement permitted Overbreak to assign the agreement to a third party under either of two circumstances: (1) with the explicit consent of PhoenixArts (License Agreement ¶ 29), or (2) without PhoenixArts' consent, provided that the unilateral assignment from Overbreak include, *inter alia*, a 1% increase in royalties and an assignment of all rights and "obligations and limitations" under the License Agreement (*id.*, ¶ 2(g)).

Overbreak did not satisfy either of these conditions in its "assignment" to TOL in June of 2007. First, Overbreak did not seek consent from PhoenixArts or Anderson for the assignment. Second, Overbreak's unilateral "Assignment of Rights" did not comply with ¶ 2(g) in two respects: (1) it failed to assign its *obligations* (as well as its rights) under the License Agreement; and (2) it failed to include a provision for a 1% increase in royalties.[7] Thus, TOL is not a party to

_____

[7]TOL urges the court to find that the *Nunc Pro Tunc* Agreement – purportedly signed by Overbreak and TOL on January 29, 2013 – cures any potential deficiencies in this regard retroactive to June 25, 2007. TOL does not cite to any legal authority for its position that the *Nunc Pro Tunc* Agreement, which does not recite any consideration and purports to reflect a present agreement by a company (Overbreak) that was dissolved several years ago, should retroactively confer TOL rights under the License Agreement. Given that TOL has the same shareholders and officers as Overbreak did, the court is highly skeptical that this purported

9

the License Agreement and cannot assert any rights thereunder.[8]

With respect to PhoenixArts, the parties vigorously dispute (a) what rights, if any, Anderson originally conveyed to PhoenixArts before it entered into the License Agreement with Overbreak; and (b) to the extent that Anderson conveyed any rights to PhoenixArts, whether those rights reverted to Anderson when PhoenixArts was administratively dissolved.[9]  Anderson has averred that, at an unspecified time, he orally granted an exclusive license to PhoenixArts to sub-license his Patents.  He also argues (and avers), without citation to any legal authority, that the license he conveyed to PhoenixArts automatically "reverted" to him upon the dissolution of PhoenixArts.  (*See, e.g.*, Verified Compl. ¶ 14 ("Upon the dissolution of PhoenixArts, all right,

---

agreement reflects an arms length transaction, rather than simply a *post hoc* attempt by Mr. Sieling (and the other common owners/officers of TOL and Overbreak) to justify their infringing activity retroactively.  At any rate, even if the *Nunc Pro Tunc* Agreement had retroactive legal effect, it fails to include the required 1% royalty increase and, therefore, does not constitute a valid unilateral assignment under ¶ 2(g).

[8]Whether TOL could be liable for the debts of Overbreak – if any claims against Overbreak by Anderson remain actionable – under an *alter ego* or successor liability theory may present a distinct legal question, with respect to which the court expresses no opinion.

On a separate note, ¶ 5 of the License Agreement provided that it would not renew if, upon a renewal date, the Licensee was in material breach of the agreement.  As of the second renewal date, Overbreak (and/or TOL) had let the Foreign Patents expire without notice to Anderson, in plain violation of ¶ 11(c), and had failed to cure the royalty payment deficiencies identified by Anderson, which may have constituted a violation of ¶ 6.  Also, Overbreak and TOL had not furnished royalties or provided royalty statements to Anderson from Q4 2006 forward, in violation of ¶ 2(c).  If ¶ 5 was self-executing and one or more of these breaches constituted a material breach – which appears to be the case – the agreement would have expired by its own terms on December 31, 2009, even if it had otherwise remained effective after June 2007.

[9]Until TOL filed its Reply, the court was not aware of the corporate history of PhoenixArts, including that it was administratively dissolved in September 2004, reinstated in October 2004, and administratively dissolved a second and final time in August 2005.  The courts also notes that the parties have not drawn any distinction between the legal effect of the first dissolution and the legal effect of the second dissolution.

10

title, interest in and to the Anderson Patents reverted to Mr. Anderson."); Anderson Decl. ¶ 4; PI Hearing 35:19-22.)  In response, TOL points out that PhoenixArts represented that it was the sole owner of the Patents in the License Agreement, which, it argues, creates a material issue of fact as to whether Anderson owns the Patents.  (*See, e.g.*, License Agreement ¶¶ 1(h), 1(a), 2(c).) TOL also argues that, if Anderson did orally convey ownership of the Patents to PhoenixArts, then those rights never "reverted" to Anderson because PhoenixArts failed to comply with necessary asset liquidation procedures upon its dissolution.  TOL contends that, taken together, these disputed facts preclude a finding that Anderson is likely to prevail on the merits of his patent infringement claims.

As an initial matter, under 35 U.S.C. § 261, assignments of a patent or patent application must be in writing to be effective.  *See Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358 (Fed. Cir. 2003); *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998). Therefore, Anderson could not have validly assigned title to the Patents and Patent Applications to PhoenixArts orally.  Thus, regardless of the language of the License Agreement, it appears that PhoenixArts could have not have been the sole owner of the referenced Patents and Patent Applications pursuant to an oral assignment from Anderson.  At most, PhoenixArts may orally have received a *license* to the Patents and Patent Applications, *see Waymark*, 334 F.3d at 1364 (stating that, under appropriate circumstances, "[l]icenses may be oral"), while ownership remained in Anderson's name.  Indeed, all three Patent Applications were filed in Anderson's name, and all three associated Patents were issued in Anderson's name.  Moreover, two of the Patent Applications were filed *after* PhoenixArts and Overbreak entered into the License Agreement, the USPTO issued all of the Patents in Anderson's name, and two of these Patents

11

(the 151 Patent, dated February 6, 2007, and the 487 Patent, dated May 29, 2007), were not issued until *after* PhoenixArts had been administratively dissolved on August 19, 2005.

Having reviewed the License Agreement closely, it is not clear to the court whether the parties to that agreement engaged in sloppy drafting, whether PhoenixArts made an affirmative misrepresentation, or whether the agreement simply incorporates some form of mutual mistake. For example, the "Background" section on the first page of the agreement defines PhoenixArts as the "Licensor" and states that "Licensor filed on February 14, 2003 for a United States utility patent, attached hereto as Schedule A, with respect to Rigid Helium Balloons." However ,the attached "Schedule A" is a copy of the 838 Patent Application *filed by Anderson in his own name*. Accordingly, unless the court construes "Anderson" and "Licensor" synonymously in this particular context, it is difficult to understand how the language of the License Agreement can be reconciled with the 838 Patent Application attached as Schedule A, which on its face was *not* filed by PhoenixArts. At any rate, however the parties intended the License Agreement to be construed, its language would not have overridden the requirements of federal statutory law, which does not appear to recognize oral assignments of patent ownership.

Therefore, based on the existing record, the court is satisfied that Anderson currently owns the Patents, regardless of the language in the License Agreement.[10] The issues of whether Anderson conveyed an oral license to PhoenixArts and, if so, the current status of that license are disputed issues that the court need not resolve at this early stage, particularly on an undeveloped record.

---

[10]To the extent TOL's argument concerning the effect of the Bankruptcy Case on Anderson's rights can be construed as a challenge to his ownership of the Patents, the court addresses that issue in a later section.

## II.    <u>Venue</u>

TOL argues that, under the forum selection clause in the License Agreement, Anderson was required to file this lawsuit in California.  Anderson argues that he was not bound by the forum selection clause because (1) he did not agree to the venue provisions (PhoenixArts did), (2) his lawsuit falls within ¶ 19 of the License Agreement, which permits a lawsuit to be filed "in any court" of law for violations of the agreement's confidentiality provisions, and/or (3) the License Agreement terminated before he sued TOL.[11]  As set forth in the previous section, the court has found that TOL was a not a party to the License Agreement and never received a valid assignment from Overbreak.  Thus, TOL cannot enforce the forum selection clause provision in the License Agreement in the first place and, therefore, the court will not dismiss or transfer the case on that basis.[12]

Finally, TOL has not established that, absent consideration of the forum selection clause, the traditional venue factors otherwise favor transferring the case to a different venue under 28 U.S.C. § 1404(a).  In considering a § 1404(a) motion, "a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'"  *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 647 n.1 (6th Cir.

---

[11]Here, Anderson seems to be attempting to "have his cake and eat it too": he seeks to enforce certain provisions of the License Agreement against TOL, yet argues that the venue provision – if otherwise enforceable by TOL – should not bind him.

[12]Federal courts have expressed some uncertainty as to whether Rule 12(b)(1), Rule 12(b)(3), Rule 12(b)(6), or § 1406 provides the appropriate vehicle for considering whether to enforce a forum selection clause.  In an abundance of precaution, TOL has moved under each of these provisions.  Because the court finds that TOL has no right to assert the forum selection clause in the License Agreement in the first place, the court need not address which rule(s) or statute would provide an appropriate means for its enforcement.

13

2002) (quoting *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991)); *Kerobo v. Sw. Clean Fuels, Corp.*, 285 F.3d 531 537 (6th Cir. 2002). The Sixth Circuit has suggested that relevant factors to consider include: (1) the convenience of the parties and witnesses; (2) the accessibility of evidence; (3) the availability of process to make reluctant witnesses testify; (4) the costs of obtaining willing witnesses; (5) the practical problems of trying the case most expeditiously and inexpensively; and (6) the interests of justice. *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). The burden is on the defendant to establish that a transfer is warranted. *Blane v. Am. Inventors Corp.*, 934 F. Supp. 903, 907 (M.D. Tenn. 1996) (citing *Factors, Etc. v. Pro Arts, Inc.*, 579 F.2d 215 (2d Cir. 1978)); *Smith*, 578 F. Supp. 2d at 958 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S. Ct. 839, 91 L. Ed. 1055 (1947)). Thus, unless the balance of these factors weighs strongly in favor the defendant seeking transfer, "the plaintiff's choice of forum should rarely be disturbed." *Id.*; *see also Smith v. Kyphon*, 578 F. Supp. 2d 954, 958 (M.D. Tenn. 2008).

Here, Anderson is a resident of Hendersonville, Tennessee, a city within this judicial district. TOL has not established that the burden on TOL of litigating in Tennessee would outweigh the burden on Anderson of litigating in California. Also, TOL has not established that the convenience of non-party witnesses, as opposed to employee witnesses, would be adversely affected by litigating the case in this court. TOL has identified only one potential material witness who is not currently employed by TOL. *See Smith*, 578 F. Supp. 2d at 963 (a party's employees' "convenience is of lesser relevance," because they "can be compelled to testify on behalf of their employer"). Moreover, that witness, Elizabeth Risha, testified at the PI Hearing in this case, demonstrating that she is capable and willing to testify voluntarily on TOL's behalf. To

14

the extent that TOL possesses business records that may be relevant to the litigation, it has not demonstrated that litigating in this forum would, in light of modern electronic discovery techniques, impose more than the ordinary costs of discovery. TOL also appears to concede that this court and a California district court are both similarly positioned with respect to issues relating to conflicts of laws and the capacity to conduct a fair trial.

Based on these considerations, the court finds that TOL has not met its burden to justify transfer of the case under § 1404(a).

## III.    **Standing**

TOL argues that Anderson lacks standing to assert his state law claims and his federal patent infringement claims. As an initial matter, based on the existing record, the court has already found that Anderson did not convey ownership of the Patents to PhoenixArts. To the extent that TOL's arguments are premised on the assumption that PhoenixArts – not Anderson – presently owns the Patents, the court rejects those arguments at this stage.

Under the Chapter 13 rules in effect when Anderson filed his petition, Anderson was required to file a schedule containing all of this assets and liabilities, including all of his legal or equitable interests in property (including intellectual property) at the commencement of the case. *See* 11 U.S.C. § 521(a)(1).[13] While his Chapter 13 Plan was being administered, Anderson was also statutorily required to declare all property acquired after the commencement of the case. *See id.* § 1306(a)(1); *In re Seafort*, 669 F.3d 662, 667 (6th Cir. 2012). The Patent Applications, Patents, and Foreign Patents at issue here each were filed and/or issued in Anderson's name

_____

[13]In April 2005, Congress amended § 521 to add certain provisions, *see* PL 109-8, 2005 § 256 (2005), but those amendments did not obviate Anderson's general obligation to disclose property that constituted "property of the estate."

15

during the five-year pendency of his Chapter 13 Plan, yet Anderson never declared them as assets or revealed them to the Chapter 13 Trustee. It appears that they should have been, particularly where Anderson takes the position here that he always owned those assets and had merely licensed them to PhoenixArts until its dissolution.[14]

Here, TOL has a strong case that the right to recover unpaid royalties from Overbreak – *i.e.*, Anderson's right to profit from exploitation of the Patents, Patent Applications, and Foreign Patents during the time frame of the Bankruptcy Case – belonged to the bankruptcy estate. Had Anderson disclosed these assets, his plan would have been modified, and his creditors would have received more money through his Chapter 13 Plan. Indeed, by failing to disclose the royalty stream, Anderson may have defrauded his creditors.[15] As a consequence, he may lack standing to pursue those claims here.[16]

---

[14]Under Chapter 13, a debtor remains in possession of all property of the bankruptcy estate and can exercise the rights and powers of the trustee under certain circumstances. *Id.* § 1306(b) and § 1303. Here, the parties have not addressed whether the purported license to PhoenixArts was enforceable in the absence of notice to the Chapter 13 Trustee.

[15]On February 5, 2003 – one year after filing for Chapter 13 bankruptcy – Anderson filed the Articles of Organization for PhoenixArts with the Tennessee Secretary of State. On February 14, 2003, Anderson filed the first Patent Application in his own name, after which PhoenixArts claimed sole ownership of the Patents and associated Applications in the License Agreement on February 22, 2003. Anderson then collected over a million dollars in royalties from Overbreak based on exploitation of the Patents, Patent Applications, and/or Foreign Patents in his name, but he does not appear to have disclosed that income in the Bankruptcy Case. Furthermore, even after the alleged license to PhoenixArts purportedly "reverted" to Anderson when PhoenixArts was administratively dissolved, Anderson did not disclose the Patents, pending Patent Applications, Foreign Patents, and/or the associated royalty income stream in the Bankruptcy Case. Anderson now claims that he always owned these assets. Given this chain of events, if there is a reasonable explanation for Anderson's failure to disclose these assets at any point before the close of the Bankruptcy Case, it is not self-evident to this court.

[16]Even if Anderson has standing to assert claims for unpaid royalties by Overbreak, this case could present circumstances justifying an exercise of judicial estoppel to bar the contract claims. For example, courts have often found that, where a debtor unreasonably fails to declare a

However, the right to profit from exploitation of the Patents and Patent Applications during the pendency of the Bankruptcy Case is distinct from the ultimate legal ownership of those Patents.  As discussed above, the existing record contains Patent Applications filed by Anderson and associated Patents issued to Anderson.  There is no bankruptcy trustee at the moment and TOL has not established that PhoenixArts has a present claim of exclusive ownership over the Patents.  Therefore, the court is not persuaded by TOL's argument that Anderson lacks standing to enforce the Patents at this point.  Thus, at least at this stage, the court is satisfied that Anderson owns the Patents and can sue to protect against their infringement.[17]

## IV.   <u>Motion for Preliminary Injunction</u>

### A.     Standard of Review

Under Fed. R. Civ. P. 65, a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.  *Winter v. Nat'l Resources Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).  Because substantive matters of patent infringement are unique to patent law, the estimated likelihood of success in establishing infringement is governed by Federal Circuit law.  *Revision Military ,Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012).

---

viable cause of action as a contingent asset in Chapter 13 proceedings, that debtor may be judicially estopped from asserting that cause of action following the close of a bankruptcy case. *See, e.g.*, *Richardson v. United Parcel Service*, 195 B.R. 737, 738-39 (E.D. Mo. 1996).

[17]It may be that, if the bankruptcy court were to reopen the Bankruptcy Case, Anderson's interests in the Patents could be subject to those proceedings and the bankruptcy trustee could seek to intervene in this case as the real party in interest.  Nevertheless, the Bankruptcy Case was closed several years ago, and the record here contains three patents applied for and issued in Anderson's name.

17

Under that standard, a movant seeking a preliminary injunction can establish a sufficient likelihood of success on the merits by showing that success is more likely than not. *Id.* "[T]he weight of the likelihood may be considered as an equitable factor, along with issues of the position of the parties with respect to the status quo, in the ultimate balance of equities." *Id.*

### B.    Application

1.    Likelihood of Success on the Merits

Under 35 U.S.C. § 271, anyone who, "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." In its briefing, TOL argues that there are questions of fact as to whether Anderson owns the Patents, whether the Patents are valid, and whether the HoverDiscs in question constitute infringing devices. Under 35 U.S.C. § 282, an issued patent comes with a statutory presumption of validity at every stage in litigation. *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1319-27 (Fed. Cir. 2008). Only if an alleged infringer raises a substantial question concerning the validity of the patent as an affirmative defense must the party seeking injunctive relief establish that the invalidity defense lacks merit. *Id.* at 1327-28. If an infringer is unable to "identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998). To overcome the presumption of validity, defendants must show invalidity "by clear and convincing evidence." *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed. Cir. 1987).

As set forth above, the court has found that Anderson currently owns the Patents and can sue to protect against their infringement. Furthermore, based on the existing record, TOL has not

presented a viable argument that the Patents are invalid.  Also, TOL's argument that manufacture

and sale of HoverDiscs would not infringe the Patents strikes the court as disingenuous, given

that TOL's position is that it had a valid and exclusive license to exploit the Patents under the

License Agreement in the first place.  Instead, the existing record establishes that TOL does not,

and did not, have a right to exploit the Patents, yet it utilized the Patents in the manufacture and

sale of the HoverDisc toy from June 2007 forward, including current marketing efforts and a

projected "re-launch" of the product in 2013.  Thus, Anderson has demonstrated that he is

reasonably likely to succeed on the merits of his claim that TOL was infringing the Patents.[18]

### 2.    Irreparable Harm

"[T]he irreparable harm inquiry seeks to measure harms that no damages payment,

however great, could address."  *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930  (Fed.

Cir. 2012).  "Price erosion, loss of goodwill, damage to reputation, and loss of business

opportunities are all valid grounds for finding irreparable harm."  *Id.* (citing *Abbott Labs v.

Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008)); *Polymer Technologies, Inc. v. Bridwell*, 103

F.3d 970, 974 (Fed. Cir. 1996).[19]

---

[18]The preliminary injunction is premised on TOL's infringing activity only.  Therefore, for purposes of Rule 65, the court does not address the likelihood that Anderson will succeed on the merits of his claims other than the patent infringement claims.

[19]In *Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552 (Fed. Cir. 1994), the Federal Circuit stated that a strong showing of a reasonable likelihood of success entitles the patentee to a presumption of irreparable harm.  However, following the Supreme Court decision in *eBay Inc. v. MercExchange*, *L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006), some federal districts courts have found that the *Reebok* presumption no longer applies and that the burden remains on the patentee to present sufficient evidence of irreparable harm, *see Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1306-1307 (D. Utah 2008) (collecting cases), while other district courts have continued to apply the presumption.  *See*, *e.g.*, *Domino's Pizza Franchising, LLC v. Yeager*, No. 09-14704, 2010 WL 374116, at *4 (E.D. Mich. Jan. 25, 2010).  Here, Anderson did not argue that a presumption applies, the parties did not brief the issue, and

At the evidentiary hearing, Anderson offered persuasive testimony on all of these points.

Anderson testified that he has been seeking to utilize his Patents for a re-launch of the HoverDisc

or a similar toy with other toy manufacturers, but the inability to demonstrate that he can offer an

exclusive license for the Patents is preventing him from entering into any deals.  Anderson also

testified that TOL recently has been producing HoverDiscs of poor quality, thereby diminishing

the potential value of Anderson's Patents.  He also testified that TOL has been marketing the

HoverDiscs at a lower effective retail price than Overbreak did previously, which reduces the

profit margin on each sale and thereby makes the Patents less valuable to other companies.

Anderson testified that Overbreak's continuing use of his Patents threatened to degrade the value

of those Patents to such a degree that other companies might not do business with him at all.[20]  In

light of this testimony, the court finds that Anderson has established that he will suffer multiple

forms of irreparable harm if TOL does not cease its infringing activity.

### 3.    The Balance of Hardships

With respect to the balance of hardships, a district court "must balance the harm that will

occur to the moving party from the denial of the preliminary injunction with the harm that the

non-moving party will incur if the injunction is granted."  *Hybritech Inc. v. Abbott Labs.*, 849

F.2d 1446, 1457 (Fed. Cir. 1988).  Where the harm to an alleged infringer from a preliminary

---

Anderson demonstrated with affirmative evidence that he is likely to suffer irreparable harm in
the absence of an injunction for the reasons set forth herein.  Therefore, application of the
*Reebok* presumption would make no difference here, and the court need not consider its
continuing validity post-*eBay*.

[20]In oral argument, TOL characterized Anderson's claims of irreparable harm as
"laughable" and emphasized that Anderson stood to earn a lot of money if TOL proceeded with
its early 2013 re-launch of the HoverDisc.  (*See, e.g.*, PI Hearing Transcript at 29:8-9 and 131:21-
132:15.)  However, even if Anderson could profit from doing business with TOL, that fact would
not obviate the irreparable harm caused by infringement of his Patent rights.

injunction is self-inflicted, courts typically find that such harm is a natural consequence of infringing activity that does not weigh against issuance of an injunction.  *See, e.g.*, *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983) (injunction warranted, where infringing party took a "calculated risk" that it might infringe patents at issue); *i4i Ltd. P'ship, v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010) ("[N]either commercial success, nor sunk development costs, shield an infringer from injunctive relief . . . . [The infringer] is not entitled to continue infringing simply because it successfully exploited its infringement."); *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) (district court did not abuse discretion in refusing to consider infringer's expenses for designing and marketing the infringing product); *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."); *Smith & Nephew, Inc. v. Synthes (U.S.A.)*, 466 F. Supp. 2d 978, 984-85 (W.D. Tenn. 2006) (finding that impact of ceasing operations related to infringing product did not weigh in favor of infringer, where such hardship "is the consequence of a patent infringement"); *Zen Design Grp. Ltd. v. Clint*, No. 08-cv-14309, 2009 WL 4050247, at *6 (E.D. Mich. Nov. 23, 2009) ("The hardship to [the infringer] in enjoining him from selling the infringing product is of his own creation and should be not be considered in the analysis.").

Here, the balance of hardships favors Anderson.  To the extent TOL incurs damages from ceasing its manufacturing and marketing efforts for the HoverDisc, that harm is self-inflicted and is the natural consequence of its infringing activity.  TOL acted without a valid license to exploit the Patents and continued to press forward with its projected 2013 re-launch of the HoverDisc,

21

even after Anderson appropriately challenged TOL's right to exploit the Patents.[21]

By contrast, as explained in the previous section, the hardships to Anderson from TOL's infringing activity were substantial, threatening to cause irreparable harm to Anderson if TOL continued to market and sell the HoverDisc as planned. Accordingly, the balance of hardships weighs strongly in favor of Anderson.

### 4.    Public Interest

The patent statute, 35 U.S.C. § 261, which exercised power granted to Congress by the United States Constitution, Art. I § 8, cl. 8, reflects a strong public policy interest in "promot[ing] the progress of the useful arts." *Smith*, 718 F.2d at 1557; *see also PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996) (noting "the strong public policy favoring the enforcement of patent rights"). This factor favors enforcement of the Patents against infringing activity by TOL.

### 5.    Conclusion

Anderson has justified the issuance of a preliminary injunction against TOL to restrain it from infringing his Patents.

## V.    Motion for Leave to File Motion for Partial Summary Judgment

Anderson seeks leave to file a motion for partial summary judgment on the following

---

[21]Indeed, based on the existing record, it appears that TOL initially recognized that it did not have a valid license to the Patents. Only *after* Anderson backed out of the proposed licensing deal did TOL claim to have possessed a license all along. At any rate, even if TOL ultimately proves to be correct that Anderson lacks standing to sue for patent infringement or is otherwise barred from asserting the infringement claims – a position that the court finds unpersuasive at this stage – it appears that TOL does not and never had a valid right to utilize the Patents in the first place. Thus, regardless of which entity or entities ultimately prove to be the appropriate parties in interest, TOL's utilization of the Patents was likely unlawful, and the damage it will have incurred from ceasing that activity will have been self-inflicted.

22

three issues: (1) the License Agreement was terminated; (2) TOL has no rights under the License Agreement; and (3) TOL infringed the Patents.  In response, TOL argues that the motion is premature, because there are substantial disputes concerning these and other material facts that will require discovery.  TOL argues, *inter alia*, that the facts will show that Anderson lacks standing to bring some or all of his claims, that Anderson will not be able to demonstrate that TOL actually infringed the Patents, and that the Patents may be invalid in light of *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007).

As an initial matter, the court's findings herein have been made under the Rule 65 standard, which does not preclude the parties from addressing those issues at a later stage in the case upon a complete evidentiary record.  Furthermore, this case presents a myriad of factual and legal issues that require discovery and/or further consideration by the parties.[22]  Thus, even to the extent that Anderson seems likely to prevail on certain facts – such as the lack of a valid assignment to TOL – the court perceives minimal benefit from considering a partial summary judgment motion at this early stage.  Accordingly, the court will deny the motion without prejudice.

## CONCLUSION

For the reasons stated herein, Anderson's Motion for Preliminary Injunction was granted, TOL's Motion to Dismiss or Transfer will be denied without prejudice, and Anderson's Motion for Leave to File a Motion for Partial Summary Judgment will be denied without prejudice.

---

[22]For instance, both parties appear to have played fast and loose with the rights and obligations of their previous related companies – PhoenixArts vis-a-vis Anderson and Overbreak vis-a-vis TOL – leading to disputes about the legal effect of certain past acts and omissions.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

24

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

LLOYD RANDALL ANDERSON,    )
             )
    Plaintiff/Counter-Defendant, )
             )
v.              )  Civil No. 3:12-1312
             )  Judge Trauger
TOL, INC.,        )
             )
    Defendant/Counter-Plaintiff. )

## ORDER IN CIVIL CONTEMPT

A hearing was held on May 29, 2013 on the plaintiff's Motion to Show Cause (Docket No. 62). Oral argument and testimony was presented at the hearing. At the conclusion of the hearing, the court announced its ruling from the bench, which is incorporated herein by reference as if set forth verbatim. For the reasons expressed on the record, the court finds, by clear and convincing evidence, that TOL, Inc. and/or its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and others acting in active concert or participation with them have violated this court's Preliminary Injunction (Docket No. 36), which was effective upon the posting of bond by the plaintiff on February 14, 2013, by infringing the Anderson Patents, using Anderson's confidential information and licensed technology, selling or offering for sale the patented products and interfering with Anderson's rights in the Anderson Patents and the licensed technology.

As a sanction for this contempt, it is hereby **ORDERED** that the defendant will pay to the plaintiff all reasonable attorney's fees, expenses and costs associated with the filing of the Motion to Show Cause and its pursuit in this court through the hearing held on May 29, 2013. It

25

is further **ORDERED** that the stay of discovery is **LIFTED** only to the extent that the plaintiff

may pursue discovery and an accounting of the sale and offering for sale of the plaintiff's

patented products by the defendant and all other related entities, including but not limited to

Alive Products Limited and its United States affiliate.  The plaintiff will be entitled to

appropriate royalties for all sales from February 14, 2013 forward.  Should the plaintiff establish

such sales, the court will award as additional sanctions for contempt the plaintiff's attorney's

fees, expenses and costs incurred in pursuing this discovery and/or accounting.

It is so **ORDERED**.

ENTER this 30th day of May 2013.

_____
ALETA A. TRAUGER
U.S. District Judge

26